United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 14, 2003**

Charles R. Fulbruge III
Clerk

REVISED APRIL 11, 2003
**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 00-10512**
_____

**MARK ROBERTSON,**

**Petitioner,**

**versus**

**JANIE COCKRELL, DIRECTOR, Texas
Department of Criminal Justice -
Institutional Division,**

**Respondent.**

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER,[*] BARKSDALE, EMILIO M. GARZA, DEMOSS, BENAVIDES, STEWART, DENNIS, and CLEMENT, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989) ("<u>Penry I</u>"), the United States Supreme Court held that the first two "special issue"

_____

[*]Judge Wiener concurs in the judgment only.

interrogatories in the Texas capital sentencing instruction,[1] though facially valid, see Jurek v. Texas, 428 U.S. 262 (1976), failed to satisfy the constitutional requirement that a capital defendant be entitled to present to his jury — and have it give mitigating effect to — proffered evidence of childhood abuse. Twelve years later, following Penry's second trial, conviction, and capital sentence, the Court held that the supplemental instruction given at sentencing failed to cure this defect. Penry v. Johnson, 532 U.S. 782 (2001) ("Penry II").

Before this en banc court, Mark Robertson, a victim of childhood abuse and self-inflicted substance addiction, argues that the same supplemental instruction given to his sentencing jury similarly failed to cure the alleged defects of the Texas special issues. This case constitutes a test, first, of the circumstances under which the Texas special issues might fail to facilitate a sentencing jury's consideration of mitigating evidence and, second, of the supplemental instruction's ability to cure such a failure.

Because Robertson's evidence — in quality and quantity — does not match Penry's, this court concludes that the statutorily prescribed Texas special issues allowed Robertson's jury to give

---

[1]Acts 1973, 63rd Leg., R.S., ch. 426, art. 3, § 1, 1973 Tex. Gen. Laws 1125, amended by Acts 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898 (currently Tex. Code Crim. Proc., art. 37.071(b)).

2

mitigating effect to his proffered evidence; they do not, therefore, stand in need of cure. Moreover, absent a presentation of sufficient Penry-quality mitigating evidence, the trial court's recitation of this supplemental instruction cannot constitute error.

## I. BACKGROUND

On the evening of August 19, 1989, Robertson shot 19-year-old Sean Hill, his friend and drug supplier, in the back of the head with a .38 caliber firearm. At the time of the murder, Hill was fishing behind his grandmother's house in Dallas, Texas. Leaving his dead friend's body in the pond, Robertson entered the house and killed Edna Brau, Hill's grandmother, also with a single shot, as she lay on her couch watching television. Robertson stole Hill's drugs and Brau's purse, car and papers, and other personal belongings. Several days later he fled to Las Vegas, Nevada, where he was apprehended by local police.

Robertson was tried for these two murders and his previous killing of a 19-year-old convenience store clerk during a robbery. For the murders of the clerk and Hill, Robertson received concurrent life sentences. For killing Brau, Robertson was found guilty of capital murder. Acts 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, Tex. Gen. Laws 1123, amended by Acts 1993, 73rd Leg., R.S., ch. 900, § 1.01 (currently Tex. Penal Code § 19.03(a)(2)).

Under 1989 Texas law, to impose a capital sentence the jury had to answer two questions in the affirmative. First: Was the killing deliberate? Second: Does the defendant pose a danger to others? A negative answer for either special issue would result in a life sentence.[2] The court also gave the jury a supplemental instruction in which it was told that Robertson could avoid a capital sentence — even if the answers to both questions were affirmative — should the jury find sufficient mitigating factors. To give effect to such a determination, the trial court instructed the jury to change its answer to either of the special issues from "Yes" to "No."[3]

_____

[2]A third issue, inquiring whether the defendant was provoked into capital murder, is unnecessary to parse here. Acts 1973, supra n.1.

[3]The supplemental instruction given to the jury reads as follows:

> You are instructed that you shall consider any evidence, which, in your opinion, is mitigating. Mitigating evidence is evidence that reduces the defendant's personal or moral culpability, or blameworthiness, and may include, but is not limited to an aspect of the defendant's character, record, background, or circumstances of the offense for which you have found him guilty. Our law does not specify what may or may not be considered as mitigating evidence. Neither does our law provide a formula for determining how much weight, if any, a mitigating circumstance deserves. You may hear evidence, which in your judgment, has no relationship to any of the special issues, but if you find such evidence is mitigating under these instructions, you shall consider the following instructions of the court. You and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating circumstances, if any, including those which have no relationship to any of the special issues, deserves.

At sentencing the state presented evidence, <u>inter alia</u>, relating to Robertson's past criminal behavior, which included serious vandalism at about age 12, taking a loaded handgun to school at 13, car theft and destruction of property at 14, marijuana possession at 15 and 18 (the second resulting in conviction), an aggravated robbery conviction (using a baseball bat and knife) at 18, and passing bad checks at 19. He had also violated the terms of probation by failing to report, attend drug counseling, and perform community service. The state also presented extensive evidence relating to Robertson's murder of the convenience store clerk and of his bad prison behavior since incarceration, including jail-cell arson and an escape attempt.

---

You are instructed that some mitigating evidence, if any, may not be relevant to resolving the special issues but may be relevant in determining whether or not the defendant should be put to death.

In answering the special issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the special issues are 'Yes,' and you also believe from the mitigating evidence, if any, that the defendant should not be sentenced to death, then you shall answer at least one of the special issues 'No' in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you. In this regard, you are further instructed that the State of Texas must prove beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you.

Robertson presented testimony at the punishment stage from his two sisters, mother, stepfather, uncle, aunt, cousin, former girlfriend, and friends of the family.

Robertson's biological father was an alcoholic who would often come home drunk and make the children stay awake at the foot of his bed until he went to sleep; otherwise they would receive a beating. Because Robertson was a baby when most of the abuse occurred, he was spared, but as he grew, he received more abuse. He witnessed both physical and verbal abuse of his mother and siblings. Sometimes the father would beat the other children with a board.

When Robertson was eight or nine years old, his mother left his father, but she reclaimed the children six months later, and his father subsequently disappeared. Robertson adapted to his new home better than did his older siblings and began calling his mother's husband "father." His mother and stepfather provided a good home to him and treated him well. Family and friends testified that Robertson was always respectful, polite, and helpful. Robertson also fulfilled his promise to obtain a GED if his parents would allow him to quit school. Robertson was described by his mother as being "very smart."

Robertson also offered evidence regarding his struggle with drugs. He became addicted at the age of 14 or 15. Upon

catching him smoking marijuana, his parents sent him to a drug rehabilitation clinic; they removed him ten days later, after he threatened to run away.  He and a companion committed a robbery in November 1987 while high on cocaine.  In 1988, when Robertson was on bond for aggravated robbery, he entered another drug treatment facility.  Robertson almost completed the program, but left for Florida when his counselor became ill and died.  After Robertson was arrested and convicted for violating the terms of his probation, he checked himself into Charter Hospital for treatment and completed the six-week program.  He then went to the House of Hope in Sherman, Texas, but stayed only about forty days.

Robertson also presented the testimony of several witnesses who described him as having a good character and a lack of a violent history.  Despite having a psychiatrist available and being given an additional four days during the punishment phase to conduct psychological testing, Robertson presented no psychiatric or psychological testimony.

For his murder of Brau, the jury answered both special issues in the affirmative.  Accordingly, the court entered a sentence of death in February 1991.

On direct appeal the Texas Court of Criminal Appeals affirmed his capital sentence.  Robertson v. State, 871 S.W.2d 701 (Tex. Crim. App. 1993).  Among other issues, Robertson argued that

7

the trial court erred by submitting the above-described supplemental instruction in lieu of a proposed third special issue regarding mitigating evidence. The court held that the supplemental instruction fully comported with <u>Penry I</u>, the controlling Supreme Court precedent, as it permitted, indeed invited, the jury to consider all of the constitutionally relevant evidence. The Supreme Court subsequently denied Robertson's petition for writ of certiorari. <u>Robertson v. Texas</u>, 513 U.S. 853 (1994).

Three years later, Robertson filed a petition for habeas corpus relief in the state trial court. The court held an evidentiary hearing and recommended that relief be denied. It held, <u>inter alia</u>, that the jury instructions were adequate to satisfy the constitutional demands of <u>Penry I</u> and related Supreme Court cases. It also noted that this conclusion comported with a host of post-<u>Penry I</u> Texas cases in which similar jury instructions had been presented. In November 1998, the Texas Court of Criminal Appeals relied upon the trial court's findings to deny the petition. <u>Ex parte Robertson</u>, writ no. 30,077-01 (Tex. Crim. App. 1998).

Robertson immediately filed a federal petition for relief pursuant to 28 U.S.C. § 2254 and once again alleged constitutional error arising from, <u>inter alia</u>, the jury instruction. The federal

district court dismissed Robertson's § 2254 petition in March 2000, concluding that Robertson could not demonstrate that the decisions of the state courts were contrary to or involved an unreasonable application of clearly established federal law, as decided by the United States Supreme Court. Robertson filed a timely notice of appeal and a request for a certificate of appealability ("COA") in the district court. The district court denied COA and Robertson filed the instant application for a COA with this court.

The district court's denial of relief was affirmed by this court, Robertson v. Johnson, 234 F.3d 890 (5th Cir. 2000), and he sought certiorari from the United States Supreme Court. In 2001 the Supreme Court decided Penry II, holding that the same set of instructions had failed to give the jurors a "'vehicle,'" Penry II, 532 U.S. at 787 (quoting Penry I, 492 U.S. at 326), by which they might "'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'" Penry II, 532 U.S. at 797 (quoting and adding emphasis to Penry I, 492 U.S. at 319). The Supreme Court subsequently vacated this court's decision and remanded it for reconsideration. Robertson v. Johnson, 533 U.S. 901 (2001). In January 2002 a panel of this court concluded that "there is no substantial difference between the jury instructions on mitigation given in this case and those given in Penry II," granted Robertson's motion for a COA and granted the writ,

9

requiring Robertson to be retried for the penalty phase of his prosecution. Robertson v. Cockrell, 279 F.3d 1062 (5th Cir. 2002). Upon the state's motion, this court reheard the case en banc. Robertson v. Cockrell, 300 F.3d 881 (5th Cir. 2002).

## II. STANDARD OF REVIEW

This instant case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as Robertson's habeas petition was filed after the effective date of the Act. 28 U.S.C. § 2254(d) (2002). Thus, the AEDPA applies to both his COA application and his habeas petition. Lindh v. Murphy, 521 U.S. 320, 335-36 (1997); Nobles v. Johnson, 127 F.3d 409, 412-13 (5th Cir. 1997).

To prevail on an application for a COA, an applicant must make a

> substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether. . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

Moore v. Johnson, 225 F.3d 495, 500 (5th Cir. 2000), cert. denied, 532 U.S. 949 (2001) (quotations and citations omitted). We grant Robertson's request for a COA, as he raises issues that are debatable among reasonable jurists. Id. at 500.

To prevail on a petition for writ of habeas corpus, a petitioner must demonstrate that the state court proceeding

10

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see Moore, 225 F.3d at 501. Before this court may grant habeas relief under the "unreasonable application" clause, the state court's application must be more than merely incorrect. Caldwell v. Johnson, 226 F.3d 367, 372 (5th Cir. 2000). The appropriate inquiry is "'whether the state court's application of clearly established federal law was objectively unreasonable.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 409 (2000)).

### III. DISCUSSION

In Penry I, the Supreme Court held that the Texas capital sentencing framework, though facially valid, see Jurek, 428 U.S. 262, can fail, in certain circumstances, to satisfy the constitutional requirement that a capital defendant is entitled to present to his jury — and have it give effect to — mitigating evidence. The case at bar constitutes a test of the evidence — both in quality and quantity — that provokes such a failure.

The evidence that Johnny Paul Penry presented to his jury upon sentencing for the rape, beating, and murder of Pamela Carpenter consisted of extreme childhood abuse and mental retardation. As a consequence of these disabilities, Penry

11

suffered from an inability "to control his impulses or to evaluate the consequences of his conduct." Penry I, 492 U.S. at 322.

The Court held that the Texas special issues failed Penry in two ways. Most prominently, the first special issue (the inquiry into the "deliberate[ness]" of the defendant's acts) did not give the jury the ability "to fully consider and give effect to [Penry's] mitigating evidence." Id. at 315. The severity of Penry's impairment, the Court said, suggests a lack of culpability. While "culpability" and "deliberate[ness]" are not mutually exclusive categories, the Court was uncertain that, in the absence of a statutory definition of "deliberately," this particular special issue gave full mitigating effect to evidence of a profound moral impairment. Id. at 323.

The second special issue — inquiring into the defendant's "continuing threat to society" — also presented a challenge for Penry's peculiar evidence. While poor impulse control might be relevant to the first inquiry (positively), it is also relevant to the second, though negatively. In the words of the Court, Penry's evidence was a "two-edged sword": Even as it diminished his culpability, it magnified his dangerousness. Id. at 324.

The Supreme Court concluded that Penry was constitutionally entitled to receive instructions that would provide the jury with a vehicle for expressing its "reasoned moral

12

response" to the mitigating evidence and would permit it to give effect to this evidence by declining to impose the death penalty. Id. at 328.

The decision in Penry I placed Texas trial courts in a difficult position when trying capital defendants. They could not craft entirely new jury interrogatories, as the precise questions had been written by the state legislature. Nor could they suspend the trials in anticipation of legislative remediation, as the legislature would not meet again until 1991 and its reaction was unknown. Hoping to provide timely and Penry-compliant trials, the courts generally chose to cure the perceived deficiencies in the jury interrogatories by issuing, when appropriate, the supplemental instruction described above. This the Texas courts did from the pronouncement of Penry I to September 1, 1991, when the amended statute went into effect.[4]

Robertson was tried in February 1991, during the hiatus between Penry I's pronouncement and the Texas legislature's

---

[4]The amended statute provides that an additional question be placed to the sentencing jury:
    Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that the sentence of life imprisonment rather than a death sentence be imposed.
Tex. Code Crim. Proc., art. 37.0711 § 3(e). Added by Acts 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898.

13

reaction. Because Robertson claimed that his mitigating evidence came within the scope of Penry I, his jury was given the supplemental instruction, as were Penry (upon retrial) and dozens of other capital defendants during this period.

Ten years after Robertson's trial, in another challenge from Johnny Paul Penry, the Supreme Court held that the supplemental instruction failed to give Penry's jurors a "'vehicle,'" Penry II, 532 U.S. at 787 (quoting Penry I, 492 U.S. at 326), by which they might "'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'" Penry II, 532 U.S. at 797 (quoting and adding emphasis to Penry I, 492 U.S. at 319). It held, moreover, that the structure of the instruction — changing the answer to one of the special issues from a truthful "Yes" to a false "No" in order to avoid imposing the death penalty — forced conscientious jurors to violate their oath to answer the interrogatories truthfully. Penry II, 532 U.S. at 798–801.

Robertson contends that the supplemental instruction created a similar set of problems for his jury. First, it failed to cure the problems noted in Penry I and underscored in Penry II, inasmuch as it did not enable the jury to give mitigating effect to his proffered evidence of childhood abuse and drug addiction. Second, it rendered the jury instructions, taken as a whole, self-contradictory, as the Court held in Penry II.

14

**A. The Texas Special Issues Provided Robertson's Jury with a Vehicle by Which It Could Give Effect to His Mitigating Evidence**

The first question before this court is whether the Texas special issues failed to provide Robertson's sentencing jury with an appropriate vehicle to give mitigating effect to his evidence of childhood abuse and substance abuse. Based on this court's consistent interpretation of <u>Penry I</u>, we hold that the statutory special issues alone were adequate to allow the jury to give effect to Robertson's mitigating evidence.

Following <u>Penry I</u>, petitioners convicted in Texas have invoked that decision and requested additional instructional vehicles for many different types of mitigating evidence, including but not limited to subnormal intelligence,[5] youth,[6] troubled or

---

[5] <u>Smith v. Cockrell</u>, 311 F.3d 661 (5th Cir. 2002); <u>Blue v. Cockrell</u>, 298 F.3d 318 (5th Cir. 2002); <u>Tennard v. Cockrell</u>, 284 F.3d 591 (5th Cir.), <u>vacated and remanded</u>, 123 S. Ct. 70 (2002); <u>Jones v. Johnson</u>, 171 F.3d 270 (5th Cir.), <u>cert. denied</u>, 527 U.S. 1059 (1999); <u>Boyd v. Johnson</u>, 167 F.3d 907 (5th Cir.), <u>cert. denied</u>, 527 U.S. 1055 (1999); <u>Harris v. Johnson</u>, 81 F.3d 535 (5th Cir.), <u>cert. denied</u>, 517 U.S. 1227 (1996); <u>Mann v. Scott</u>, 41 F.3d 968 (5th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1117 (1995); <u>Andrews v. Scott</u>, 21 F.3d 612 (5th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1114 (1995); <u>DeLuna v. Lynaugh</u>, 890 F.2d 720 (5th Cir. 1989).

[6] <u>Turner v. Johnson</u>, 106 F.3d 1178 (5th Cir.), <u>cert. denied</u> <u>sub nom. In re Turner</u>, 521 U.S. 1146 (1997); <u>Tucker v. Johnson</u>, 115 F.3d 276 (5th Cir.), <u>cert. denied</u>, 522 U.S. 1017 (1997); <u>Russell v. Collins</u>, 998 F.2d 1287 (5th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1185 (1994); <u>Cantu v. Collins</u>, 967 F.2d 1006 (5th Cir. 1992), <u>cert. denied</u>, 509 U.S. 926 (1993); <u>Drew v. Collins</u>, 964 F.2d 411 (5th Cir. 1992), <u>cert. denied</u>, 509 U.S. 925 (1993); <u>Bridge v. Collins</u>, 963 F.2d 767 (5th Cir. 1992), <u>cert. denied</u>, 509 U.S. 925 (1993);

15

abused childhood,[7] intoxication,[8] substance abuse,[9] head injury,[10]

<hr />

White v. Collins, 959 F.2d 1319 (5th Cir. 1992); Wilkerson v. Collins, 950 F.2d 1054 (5th Cir. 1992), cert. denied, 509 U.S. 921 (1993); Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992) (en banc), aff'd, 506 U.S 461 (1993); DeLuna, 890 F.2d 720.

[7]Hernandez v. Johnson, 248 F.3d 344 (5th Cir.), cert. denied sub nom. Hernandez v. Cockrell, 534 U.S. 1043 (2001); Emery v. Johnson, 139 F.3d 191 (5th Cir. 1997), cert. denied, 525 U.S. 969 (1998); Davis v. Scott, 51 F.3d 457 (5th Cir.), cert. denied, 516 U.S. 992 (1995); Allridge v. Scott, 41 F.3d 213 (5th Cir. 1994), cert. denied, 514 U.S. 1108 (1995); Jacobs v. Scott, 31 F.3d 1319 (5th Cir. 1994), cert. denied, 513 U.S. 1067, 1070 (1995); Lackey v. Scott, 28 F.3d 486 (5th Cir. 1994), cert. denied, 513 U.S. 1086 (1995); Clark v. Collins, 19 F.3d 959 (5th Cir. 1994); Motley v. Collins, 18 F.3d 1223 (5th Cir.), cert. denied, 513 U.S. 960 (1994); Madden v. Collins, 18 F.3d 304 (5th Cir. 1994), cert. denied, 513 U.S. 1156 (1995); Russell, 998 F.2d 1287; Callins v. Collins, 998 F.2d 269 (5th Cir. 1993); Drew, 964 F.2d 411; Lincecum v. Collins, 958 F.2d 1271 (5th Cir.), cert. denied, 506 U.S. 957 (1992); Barnard v. Collins, 958 F.2d 634 (5th Cir. 1992), cert. denied, 506 U.S. 1057 (1993); Graham, 950 F.2d 1009; Mayo v. Lynaugh, 893 F.2d 683 (5th Cir.), modified sub nom. Mayo v. Collins, 920 F.2d 251 (1990), cert. denied sub nom. Collins v. Mayo, 502 U.S. 898 (1991).

[8]Drinkard v. Johnson, 97 F.3d 751 (5th Cir.), cert. denied, 520 U.S. 1107 (1996); West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. denied, 520 U.S. 1242 (1997); Rogers v. Scott, 70 F.3d 340 (5th Cir. 1995), cert. denied sub nom. Rogers v. Johnson, 517 U.S. 1235 (1996); Briddle v. Scott, 63 F.3d 364 (5th Cir.), cert. denied, 516 U.S. 1033 (1995); East v. Scott, 55 F.3d 996 (5th Cir. 1995); Nethery v. Collins, 993 F.2d 1154 (5th Cir. 1993), cert. denied, 511 U.S. 1026 (1994); Sawyers v. Collins, 986 F.2d 1493 (5th Cir.), cert. denied, 508 U.S. 933 (1993); Bridge, 963 F.2d 767; Cordova v. Collins, 953 F.2d 167 (5th Cir.), cert. denied, 502 U.S. 1067 (1992).

[9]Harris v. Cockrell, 313 F.3d 238 (5th Cir. 2002); Robison v. Johnson, 151 F.3d 256 (5th Cir. 1998), cert. denied, 526 U.S. 1100 (1999); Tucker, 115 F.3d 276; Madden, 18 F.3d 304; James v. Collins, 987 F.2d 1116 (5th Cir.), cert. denied, 509 U.S. 947 (1993); Callins, 998 F.2d 269; Drew, 964 F.2d 411; Barnard, 958 F.2d 634; DeLuna, 890 F.2d 720.

16

good character,[11] mental illness,[12] antisocial personality disorders,[13] and dyslexia.[14]

Penry I required such a vehicle only with regard to evidence of diminished culpability arising from a combination of extreme childhood abuse and mental retardation. This thus requires — to ensure its "full mitigating effect" — a more capacious vehicle than the Texas special issues afforded. With equal clarity, however, the Court has also held that youth does not require additional instructions: "We decide that there is no reasonable likelihood that the jury would have found itself foreclosed from

---

[10]Smith, 311 F.3d 661; Madden, 18 F.3d 304; Barnard, 958 F.2d 634.

[11]Boyd, 167 F.3d 907; Turner, 106 F.3d 1178; Briddle, 63 F.3d 364; Lackey, 28 F.3d 486; Andrews, 21 F.3d 612; Clark, 19 F.3d 959; Crank v. Collins, 19 F.3d 172 (5th Cir. 1994), cert. denied, 512 U.S. 1214 (1994); 998 F.2d 269; Jernigan v. Collins, 980 F.2d 292 (5th Cir. 1992), cert. denied, 508 U.S. 978 (1993); Bridge v. Collins, 963 F.2d 767 (5th Cir. 1992), cert. denied 509 U.S. 925 (1993); Holland v. Collins, 962 F.2d 417 (1992), vacating 950 F.2d 169 (5th Cir. 1991), cert. denied, 509 U.S. 925 (1993); Black v. Collins, 962 F.2d 394 (5th Cir.), cert. denied, 504 U.S. 992 (1992); Wilkerson, 950 F.2d 1054; Russell v. Lynaugh, 892 F.2d 1205 (5th Cir. 1989), cert. denied, 501 U.S. 1259.

[12]Blue, 298 F.3d 318; Hernandez, 248 F.3d 344; Miller v. Johnson, 200 F.3d 274 (5th Cir.), cert. denied, 531 U.S. 849 (2000); Robison, 151 F.3d 256; Lucas v. Johnson, 132 F.3d 1069 (5th Cir.), cert. dismissed, 524 U.S. 965 (1998); Davis, 51 F.3d 457; Allridge, 41 F.3d 213; Madden, 18 F.3d 304.

[13]Smith, 311 F.3d 661; Davis, 51 F.3d 457; Demouchette v. Collins, 972 F.2d 651 (5th Cir.), cert. denied, 505 U.S. 1246 (1992).

[14]Madden, 18 F.3d 304.

17

considering the relevant aspects of petitioner's youth." Johnson v. Texas, 509 U.S. 350, 368 (1993), aff'g 773 S.W.2d 322 (Tex. Crim. App. 1989).

As to all the other types of mitigating evidence, the pertinent inquiry is and has been, by what principle should the line between Penry I and non-Penry I evidence be drawn? For ten years, this court has subscribed to a test articulated by Judge Garwood in response to Gary Graham's assertion that his youth presented Penry evidence. Was the criminal act "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own"? Graham v. Collins, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), aff'd, 506 U.S 461 (1993). This formulation encompasses four principles found in Penry I: voluntariness, permanence, severity, and attribution. Did the defendant acquire his disability voluntarily or involuntarily? Is the disability transient or permanent? Is the disability trivial or severe? Were the criminal acts a consequence of this disability?

These principles were and are readily apparent from the Court's opinion in Penry I. The principle of voluntariness is found in the Court's insistence on the defendant's constitutional right to a thorough assessment of his "culpability." 492 U.S. at 319. ("Underlying Lockett v. Ohio, 438 U.S. 586 (1978) and Eddings

18

v. Oklahoma, 455 U.S. 104 (1982) is the principle that punishment should be directly related to the personal culpability of the criminal defendant." Id.) Permanence is derived from the fixed biological character of Penry's evidence: "As a child, Penry was diagnosed as having organic brain damage, which was probably caused by trauma to the brain at birth." Id. at 307; "Penry's brain damage was probably caused at birth . . . , but may have been caused by beatings and multiple injuries to the brain at an early age." Id. at 308–309. Severity was divined from the objective expert testimony that demonstrated the unique character of the abuse he suffered, his limited cognitive faculties, and his inability to learn from his mistakes. Id. at 309–10. And attribution from the Court's belief that Penry, like other defendants whose "'criminal acts . . . are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" Id. at 319 (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). Moreover, following the Supreme Court's example and admonition, this court has decided each Penry-instruction entitlement claim "on the facts of th[e] case." Penry I, 492 U.S. at 315.

Each of our post-Penry I cases has approached the evidentiary claim with the principles sketched above. In some

19

cases we stopped after voluntariness, because this threshold requirement simply had not been met. In <u>Barnard v. Collins</u>, for instance, the self-inflicted character of substance abuse gave no occasion for engaging in further inquiry. 958 F.2d 634, 639 (5th Cir. 1992). In <u>Hernandez v. Johnson</u>, the disability was involuntary, but we stopped the inquiry after noting the transient character of the affliction, because the petitioner's mental illness could be controlled by medication and treatment. 248 F.3d 344, 349 (5th Cir. 2001). In another, the disability was neither voluntarily assumed nor transitory, but the petitioner's dyslexia was not so "uniquely severe" as to "rise to the level of a <u>Penry</u> claim." <u>Madden</u>, 18 F.3d at 308. And on yet another of Barnard's claims, that he had been beaten by his son-in-law with a tire iron several months before the crime, this court concluded that the meager evidence at bar (no expert testimony concerning brain damage or psychological defects had been offered) failed "to raise an inference 'that the crime is attributable to the disability.'" <u>Barnard</u>, 958 F.2d at 638 (quoting <u>Graham</u>, 950 F.2d at 1033).

Robertson nonetheless argues that childhood abuse is one category of evidence that <u>Penry I</u> should categorically include, on account of its debilitating character and the fact that severe and prolonged abuse was among the disabilities that Penry himself alleged. Moreover, Robertson contends, this court has

20

categorically excluded childhood abuse from the scope of Penry I. Robertson's reading of the Fifth Circuit cases is incorrect, and his overall argument is inapposite to the facts.

Robertson's misreading can be seen from a simple survey of the cases in which the assertion of childhood abuse was proffered as mitigating evidence. See supra n.7. In most, this court acknowledged the possibility that the petitioner's unfortunate childhood might require a Penry vehicle, but could not find the requisite severity or attribution. Barnard's allegation of a troubled childhood was soundly dismissed by this court, when the only evidence he adduced was that his parents divorced when he was four, he did not see his father until he was 13, lived with him briefly, and then moved in with his uncle. But the court did not dismiss out of hand the possibility that "the adverse effects of a troubled childhood might well raise a Penry issue." Barnard, 958 F.2d at 639; see also Davis v. Scott, 51 F.3d 457, 462 (5th Cir. 1995). The court addressed Robert Madden's claim in much the same way. He proved that his father abandoned him and his mother when he was two years old, that his mother remarried when he was five, and that his stepfather cared for him well. The court held, once again, that if abuse causes psychological effects to which criminal conduct is attributable, a Penry claim might exist, but the panel expressed doubt that there was abuse, that this non-existent abuse

21

had any psychological effect, and that this non-existent psychological effect led to his criminal act. Madden, 18 F.3d at 308. In Hernandez, a case in which the facts come close to Penry's, we again admitted the potential relevance of childhood abuse, where the crime is attributable to the offense. 248 F.3d at 349. And, lest it be concluded that this calculus produces possibility but not results, we recently concluded that Michael Blue's experience of parental abandonment, physical and sexual abuse, minimal brain injury, schizophrenia, and resultant poor impulse control — all supported by abundant evidence — satisfied the Graham formulation. Blue v. Cockrell, 298 F.3d 318, 321–22 (5th Cir. 2002).

In sum, Fifth Circuit caselaw recognizes the possibility that evidence of an abusive childhood might give rise to a Penry claim. But to recognize the possibility is not to concede that any history of childhood abuse rises to the level of Penry-type evidence. In Penry I, the abuse included beatings on Penry's head, which according to an expert could have produced the brain damage from which he suffered. Moreover, this evidence was inseparable from the Court's greater concern with Penry's mental retardation and poor impulse control. Childhood abuse alone is not systematically discussed by Penry I in its relation to the Texas special issues. This does not mean we can overlook the Court's

22

holding, and as shown, our cases have not done so. But the un-plumbed nature of the issue at the Supreme Court surely indicates the appropriateness of fact-specific rather than categorical analysis of childhood abuse under Penry I. Moreover, it is neither logically nor empirically true that generic childhood abuse, regardless of duration, type, or severity, bears the same characteristics as mental retardation, or complies with the four principles that this court articulated in Graham as the touchstones for identifying Penry-type evidence.

Robertson's case falls within our post-Penry I jurisprudence inasmuch as, on a factual level, his claim of childhood abuse is fairly vague and, with a lack of expert testimony, exhibits no nexus to his brutal crimes. The evidence involves Robertson's early years living with an alcoholic father, followed by a peaceful life with his mother and stepfather after he became eight or nine years old. There is at most sketchy evidence of beatings, but no evidence of experiences akin to Penry's.

The paucity of evidence leads to the conclusion that the statutory special issues were adequate to allow the jury to effectuate the mitigating potential of Robertson's evidence. This evidence did not have a "major mitigating thrust" beyond either of the special issues. Graham, 950 F.3d at 1027. Even though Robertson's experience of childhood abuse was involuntary, and

23

assuming (though this is unexplained by the evidence) that it was permanent in effect, it was shown neither to be severe nor to have any causal nexus with his crimes.

The same holds true for Robertson's plea that the mitigating effect of his drug addiction constitutes <u>Penry</u> evidence. This argument is very nearly without merit, as it utterly fails to satisfy the <u>Graham</u> formulation. Self-inflicted substance abuse is patently neither involuntary nor permanent. Because Robertson's contention fails these two prongs, there is no need to ask whether his substance abuse was severe or causally connected to his crime. In each of the many cases in which petitioners have argued that evidence of substance abuse mitigates their culpability, this court has unequivocally dismissed the contention.[15]

It is also worthwhile to reiterate that Robertson's evidence of childhood abuse and drug addiction does not constitute a "two-edged sword" — giving a strong basis for reduced culpability, while nearly assuring a jury finding, on the second interrogatory, that Robertson would remain dangerous to society.

---

[15]<u>See, e.g.,</u> <u>Harris v. Cockrell</u>, 313 F.3d 238; <u>Robison</u>, 151 F.3d 256; <u>Tucker</u>, 115 F.3d 276; <u>Drinkard</u>, 97 F.3d 751; <u>West</u>, 92 F.3d 1385; <u>Rogers</u>, 70 F.3d 340; <u>Briddle</u>, 63 F.3d 364; <u>East</u>, 55 F.3d 996; <u>Madden</u>, 18 F.3d 304; <u>Nethery</u>, 993 F.2d 1154; <u>James</u>, 987 F.2d 1116; <u>Sawyers</u>, 986 F.2d 1493; <u>Drew</u>, 964 F.2d 411; <u>Bridge</u>, 963 F.2d 767; <u>Barnard</u>, 958 F.2d 634; <u>Cordova</u>, 953 F.2d 167; <u>DeLuna</u>, 890 F.2d 720.

Such "atypical"[16] evidence led the Supreme Court in Penry's case to conclude that the Texas statutory special issues were constitutionally inadequate. This court has held, albeit on fact-specific analysis, that evidence of childhood abuse is not "two-edged" because the jury "would not have necessarily given only

---

[16]As Judge Garwood explained for the <u>en banc</u> court:
We believe that what <u>Penry</u> represents is a set of atypical circumstances of a kind that, quite understandably, neither the Texas Court of Criminal Appeals nor the Supreme Court in <u>Jurek</u> had in mind, namely <u>circumstances where the defense's mitigating evidence would have either no substantial relevance or only adverse relevance to the second special issue</u>. Typically, evidence of good character, or of transitory conditions such as youth or being under some particular emotional burden at the time, will tend to indicate that the crime in question is not truly representative of what the defendant's normal behavior is or may become over time, and that the defendant may be rehabilitable so as not to be a continuing threat to society. The core of <u>Jurek</u> — which we cannot conclude has been abandoned — is that the mitigating force of this kind of evidence is adequately accounted for by the second special issue. But in <u>Penry</u> the Court was faced for the first time with a wholly different type of mitigating evidence. Not evidence of good character, but of bad character; not evidence of potential for rehabilitation, but of its absence; not evidence of a transitory condition, but of a permanent one; but <u>nonetheless</u> evidence which was strongly mitigating because these characteristics were due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own, mental retardation, organic brain damage and an abused childhood. <u>There was no way this type of evidence could be given any mitigating force under the second special issue</u>. To recognize that, as <u>Penry</u> did, is not necessarily to deny the validity of <u>Jurek</u> as it applies to the more typical case.
<u>Graham</u>, 950 F.2d at 1029-30 (emphasis altered).

25

aggravating effect to [a petitioner's]" evidence; this is so because it "was able to consider in some manner [the petitioner's] relevant mitigating evidence . . . under Texas' sentencing scheme." Motley v. Collins, 18 F.3d 1223, 1235 (5th Cir. 1994) (emphasis in original); see Lackey, 28 F.3d at 489; James, 987 F.2d at 1121. Compare Motley, 18 F.3d at 1235 (evidence of severe childhood abuse did indeed suggest his future dangerousness, but was not the sort of "two-edged" evidence identified by Penry I, because its effect on the future dangerousness special issue was not solely aggravating).[17] The vague and inconclusive evidence submitted by Robertson leads to the same result here.

Finally, regarding his substance abuse, even if this court were willing to entertain the argument that Robertson's condition reduced his moral culpability (and thus might incline the jury to render a favorable answer to the deliberateness issue), the condition does not aggravate his exposure under the future dangerousness issue. The reason for this is simply that addiction is a treatable condition.[18]

---

[17]Two panels of this court have, however, found that evidence of childhood abuse is indeed "two-edged." The first, Mayo v. Lynaugh, 893 F.2d 683, was decided before Graham and has been subsequently overturned, implicitly by Johnson, 509 U.S. 350, explicitly in Motley, 18 F.3d at 1237. The second, Blue, 298 F.3d 318, concludes that "Blue produced substantial 'double-edged' Penry type evidence." Id. at 322.

[18]See, e.g., Harris v. Cockrell, 331 F.3d at 241-43; West, 92 F.3d at 1405; Briddle, 63 F.3d at 377; Madden, 18 F.3d at 307;

**B.** **Penry II Does Not Disturb the Fifth Circuit's Post-Penry I Case Law**

Robertson also argues that Penry II requires this court to review and revise the above-described post-Penry I jurisprudence. This contention has two components. First, he contends that this court has misinterpreted Penry I all along. Second, whatever our past approach, Penry II expands the nature and scope of evidence that requires modification of the pre-1991 statutory scheme. We reject both contentions.

The second is easily dismissed. In Teague v. Lane, 489 U.S. 288 (1989), the Supreme Court barred the application of new rules of law on federal habeas corpus review. Teague remains applicable after the passage of the AEDPA. Horn v. Banks, 536 U.S. 266 (2002). Accordingly, in Penry I, the Court demonstrated that its conclusion did not constitute a "new rule" of constitutional law.[19] In Penry II, the Court professed only to reiterate the holding of Penry I. 532 U.S. at 797. Though one might argue — as Robertson now does — that Penry II silently modifies Penry I and encroaches upon Jurek, such an act is expressly forbidden by

---

Lackey, 28 F.3d at 487; James, 987 F.2d at 1121–23; Nethery, 993 F.2d at 1161; Cordova, 953 F.2d at 167.

[19]"[I]n light of the assurances upon which Jurek was based, we conclude that the relief Penry seeks does not 'impose a new obligation' on the State of Texas." Penry I, 492 U.S. at 319 (quoting Teague, 489 U.S. at 301).

<u>Teague</u>.  Far be it from us to hold that the Court violated its own principle; we do not so read <u>Penry II</u> or so hold.

The first component of Robertson's argument requires greater explanation.

<u>Penry I</u> reaffirmed the continuing constitutionality of Texas's statutory death penalty special issues, as the Court had earlier construed them.  <u>See</u> <u>Jurek</u>, 428 U.S. 262; <u>Franklin v. Lynaugh</u>, 487 U.S. 164 (1988).  On the other hand, <u>Penry I</u> held that in some cases, the special issues did not give Texas capital juries sufficient opportunity to consider and give mitigating effect to proffered evidence.  For the reasons articulated by this court's <u>en banc</u> decision in <u>Graham</u>, we concluded that <u>Penry I</u> was an exception to <u>Jurek</u>, not <u>Jurek</u> to <u>Penry I</u>.  <u>Graham</u>, 950 F.2d at 1027.

Any doubts this court might have harbored fled when <u>Graham</u>'s logic was sustained — twice — in the Supreme Court's next term.  The first instance occurred in the course of the Court's review of <u>Graham</u>, 506 U.S 461 (1993), where it described the relationship between <u>Penry I</u> and <u>Jurek</u> as follows:

> [W]e are not convinced that <u>Penry</u> could be extended to cover the sorts of mitigating evidence Graham suggests without a wholesale abandonment of <u>Jurek</u> and perhaps also of <u>Franklin v. Lynaugh</u>. . . . As the dissent in <u>Franklin</u> made clear, virtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's "moral culpability" apart from its relevance to the particular concerns embodied in the Texas special issues.

28

<u>Id.</u> at 476 (citations omitted).[20]

The Supreme Court did so again much more emphatically in <u>Johnson v. Texas</u>, 509 U.S. 350 (1993), <u>aff'g</u> 773 S.W.2d 322 (Tex. Crim. App. 1989), a case on direct appeal, unconstrained by <u>Teague</u>'s limit on habeas review. Rejecting Johnson's argument that his youth and immaturity provided mitigating evidence beyond the scope of the Texas special issues, the Court reaffirmed the "limited view of <u>Penry</u>," 509 U.S. at 365:

> In addition to overruling <u>Jurek</u>, accepting petitioner's arguments would entail an alteration of the rule of <u>Lockett</u> and <u>Eddings</u>. Instead of requiring that a jury be able to consider in one manner all of a defendant's relevant mitigating evidence, the rule would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant.

<u>Id.</u> at 372.

Moreover, while it is inappropriate to ascribe undue significance to denials of certiorari, it should at least be noted that the Supreme Court has been loathe to disturb this court's interpretation of <u>Penry I</u>. In the decade from the <u>en banc</u> decision in <u>Graham</u> (January 3, 1992) to the end of 2002, numerous petitioners asked this court to overturn their capital sentences on the basis of <u>Penry</u>-evidence claims. Of the 47 cases we addressed

---

[20]The Court's discussion was necessary to a determination whether Graham sought a "new rule," pursuant to <u>Teague</u>, in the context of his habeas proceeding.

on the merits, this court applied the <u>Graham</u> interpretation of <u>Penry I</u> in each and concluded that only one of these petitioners, Michael Blue, had mustered evidence with a mitigating thrust beyond the special issues.  <u>Blue</u>, 298 F.3d 318.  Of the remaining 46 petitioners, 42 petitioned the Supreme Court for writ of certiorari.[21]  The Court dismissed the writ in one of them, <u>Lucas v. Johnson</u>, 132 F.3d 1069, remanded the instant case for reconsideration in light of <u>Penry II</u> and one other on separate grounds,[22] and denied the petitions in the remaining 39.[23] Furthermore, in 14 of these 39 cases petitioners alleged child

---

[21]One did not petition the Supreme Court for writ of certiorari. <u>East v. Scott</u>, 55 F.3d 996.  Two cases are so recent that certiorari filing information is not yet available.  <u>Harris v. Cockrell</u>, 313 F.3d 238; <u>Smith</u>, 311 F.3d 661 (5th Cir., Nov. 4, 2002) (<u>Smith</u> was issued prematurely while this *en banc* case was pending but it is not inconsistent herewith).

[22]<u>Tennard</u>, 284 F.3d 591, <u>vacated and remanded for reconsideration in light of Atkins v. Virginia</u> (122 S. Ct. 2242 (2002)), 123 S. Ct. 70 (2002).

[23]<u>Miller</u>, 200 F.3d 274; <u>Jones</u>, 171 F.3d 270; <u>Boyd</u>, 167 F.3d 907; <u>Robison</u>, 151 F.3d 256; <u>Lucas</u>, 132 F.3d 1069; <u>Emery</u>, 139 F.3d 191; <u>Turner</u>, 106 F.3d 1178; <u>Tucker</u>, 115 F.3d 276; <u>Drinkard</u>, 97 F.3d 751; <u>West</u>, 92 F.3d 1385; <u>Harris v. Johnson</u>, 81 F.3d 535; <u>Rogers</u>, 70 F.3d 340; <u>Briddle</u>, 63 F.3d 364; <u>East</u>, 55 F.3d 996; <u>Davis</u>, 51 F.3d 457; <u>Mann</u>, 41 F.3d 968; <u>Allridge</u>, 41 F.3d 213; <u>Jacobs</u>, 31 F.3d 1319; <u>Lackey</u>, 28 F.3d 486; <u>Andrews</u>, 21 F.3d 612; <u>Clark</u>, 19 F.3d 959; <u>Crank</u>, 19 F.3d 172; <u>Motley</u>, 18 F.3d 1223; <u>Madden</u>, 18 F.3d 304; <u>Nethery</u>, 993 F.2d 1154; <u>James</u>, 987 F.2d 1116; <u>Sawyers</u>, 986 F.2d 1493; <u>Russell v. Collins</u>, 998 F.2d 1287; <u>Callins</u>, 998 F.2d 269; <u>Jernigan</u>, 980 F.2d 292; <u>Demouchette</u>, 972 F.2d 651; <u>Cantu</u>, 967 F.2d 1006; <u>Drew</u>, 964 F.2d 411; <u>Bridge</u>, 963 F.2d 767; <u>Holland</u>, 962 F.2d 417; <u>Black</u>, 962 F.2d 394; <u>White</u>, 959 F.2d 1319; <u>Lincecum</u>, 958 F.2d 1271; <u>Barnard</u>, 958 F.2d 634; <u>Cordova</u>, 953 F.2d 167; <u>Wilkerson</u>, 950 F.2d 1054.

abuse.[24]  A sizable number of these 14 present factual allegations that are quite similar to Robertson's.  Certiorari was denied in all of those cases.  In light of the Supreme Court's consistent denial of _Penry_-based petitions, it would be unwarranted for us to abandon our established precedent under the _Graham_ framework.

In sum, _Penry II_ makes no inroads on the _Penry I_ – _Jurek_ framework that governed Texas law until the capital punishment statute was amended in 1991.  _Penry I_ does not speculate on the effect of the Texas statutory issues beyond the type of facts adduced in Penry's case.  No question was before the Court in _Penry I_ or _II_ on the general treatment of mitigating evidence under the Texas law.  Justice Kennedy concurred with the _Penry II_ opinion, a vote that would be unexpected had _Penry II_ overruled _Graham_ or _Johnson_, as he was in the majority in _Graham_ and wrote the Court's opinion in _Johnson_.  Significantly, the _Penry II_ dissent argues only with the majority's interpretation of the instruction and contains no hint of concern that _Graham_ or _Johnson_, to say nothing of _Jurek_, might be up for reevaluation.  Irrespective of the serious _Teague_ issue that would be raised by reading _Penry II_ to

---

[24]_Hernandez_, 248 F.3d 344; _Emery_, 139 F.3d 191; _Davis_, 51 F.3d 457; _Mann_, 41 F.3d 968; _Allridge_, 41 F.3d 213; _Jacobs_, 31 F.3d 1319; _Lackey_, 28 F.3d 486; _Clark_, 19 F.3d 959; _Motley_, 18 F.3d 1223; _Madden_, 18 F.3d 304; _Russell v. Collins_, 998 F.2d 1287; _Drew_, 964 F.2d 411; _Lincecum_, 958 F.2d 1271; _Barnard_, 958 F.2d 634.

undermine our post-Penry I jurisprudence, such a reading is simply wrong.

This court therefore holds that our en banc Graham formulation gives proper effect to Penry I. We emphasize our confidence in the propriety of its continued use.

## C. The Trial Court's Presentation of the Supplemental Instruction Does Not Constitute Error, Reversible or Otherwise

Robertson argues, in the alternative, that, even if his mitigating evidence is not "constitutionally relevant," the trial court's recitation of the supplemental instruction to his jury is an error requiring vacatur of his capital sentence. We disagree. In the absence of Penry-quality mitigating evidence, the presentation of this instruction does not constitute error of any sort.[25] As a result, there is no need to reach a harmlessness analysis. Nonetheless, because Robertson argues that the Supreme Court has concluded that the recitation of this supplemental instruction does indeed constitute error, a brief explanation for this holding is necessary.

In Penry II, the Supreme Court declared that the supplemental instruction is subject to two possible interpretations. Penry II, 532 U.S. at 798. First, "it can be

---

[25]Indeed, a contrary conclusion might well raise a Teague problem, since no court, including the Supreme Court, has condemned this instruction except in the Penry II context.

32

understood as telling the jurors to take Penry's mitigating evidence into account in determining their truthful answers to each special issue." Id. Alternatively, "it is possible to understand the supplemental instruction as informing the jury that it could simply answer one of the special issues 'no' if it believed that mitigating circumstances" made the death penalty inappropriate. Id. (quotations and citations omitted).

The Court found that under either interpretation the supplemental instruction failed to cure the special issues' flaws. Construed as a vehicle to effectuate Penry's mitigating evidence, the supplemental instruction was insufficient because "none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and child abuse." Id. Construed, alternatively, as a "nullification instruction," as Robertson tendentiously calls it, it "made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation." Id. at 799.

The concerns that motivated the Supreme Court in Penry II are not present in the case at bar. First, because Robertson's culpability-mitigating evidence is encompassed by the Texas special issues, there is no need to provide an additional vehicle for it. If anything, the supplemental instruction, under this interpretation, provided Robertson with a more capacious vehicle

33

than was constitutionally warranted.  Second, the supplemental instruction did not render the jury charge potentially contradictory.  The jury was not forced into the position — as they were in <u>Penry II</u> — of falsely answering "no" to the questions of deliberateness or future dangerousness.  The most that one could say is that the supplemental instruction was redundant in this case.

Absent the quality and quantity of mitigating evidence necessary to raise a <u>Penry</u> claim, we decline to find that recitation of the supplemental instruction to Robertson's jury constitutes error of any sort.

## IV. CONCLUSION

Because Robertson failed to present to his sentencing jury evidence with a major mitigating thrust beyond the scope of the Texas special issues, this court concludes that the state's ultimate decision — that there was no reasonable likelihood of <u>Penry</u> error — was not objectively unreasonable.  Accordingly, we **AFFIRM** the district court's denial of Robertson's petition.

**AFFIRMED.**

HIGGINBOTHAM, Circuit Judge, concurring:

I concur, but with respect I write separately to explain where I cannot fully subscribe and to emphasize three points. First, because the majority claims to state no new law for the circuit, the district courts and bar need not divine what new wrinkle is intended. The answer is none.

Second, it offers no new rationale beyond an effort to make the whole of this surrealistic body of law more presentable by asserting that it is the product of neutral judges engaged in an exercise of logic. With deference, I cannot agree and think it unwise to paint our work as anything more than it has been. The path of *Penry* is only an example drawn from a circle of cases linked by solution-problem-solution-problem. We have in short order moved from *Cabana v. Bullock*,[26] which allows the Supreme Court of Mississippi to find that a defendant sentenced to die on conviction by a jury of felony murder acted with the constitutionally required intent, when the convicting jury was never asked to face the issue, to *Ring v. Arizona*,[27] concluding that the finding must be made by the jury. And recently this "law logic" moved from the principle that a jury must be able to

---

[26] 474 U.S. 376 (1986); *Bullock v. Cabana*, 784 F.2d 187 (5th Cir. 1986).

[27] 536 U.S. 584 (2002).

consider and give expression to retardation as a mitigating factor to the principle that retarded persons cannot be executed at all. It is no surprise that Texas wisely moved to the common sense solution of asking the jury an additional question: whether, considering all the mitigating evidence, death should be imposed. Leaving aside why this sudden tolerance of jury discretion, this case is part of a small set left in an eddy, missing the tide in both directions. But this set of cases remains and we are obligated to state the rules for their decision as best we can, which brings me to my third point.

In our efforts to decide if a jury could give effect to the major thrust of mitigating evidence by its answering whether the defendant would be dangerous in the future, we have danced close to categorical characterization of evidence of disabilities as transient or permanent, when the true question is whether there is evidence in the record, including any expert testimony, from which a jury might conclude that the disability was permanent, child abuse for example. The very term "constitutionally relevant evidence" is misleading. A defendant is entitled to have all his mitigating evidence heard and to have a jury with the means to express its worth in its verdict. *Penry* evidence, as it is sometimes called, is a subset. It is not logic but judicial hubris to pronounce as a matter of law that even the most severe child

37

abuse creates only a transient condition. The majority dismisses the defendant's effort to push his evidence of mitigation into the *Penry* ring as contending for a categorical treatment of all child abuse. Fair enough; however, the majority also pushes in the opposite direction. We must be careful that this push not lead us to categorically exclude classes of mitigating evidence such as child abuse. That result would be the result of neither logic nor law in the proper sense. While, for example, we are well within our compass to treat alcohol or drug use which can wreak permanent damage as legally irrelevant by drawing upon a principle of law, such as refusing to consider disability voluntarily induced, it is not our role to make the medical judgment that a condition is transient or permanent. And we ought not attempt to judge the imprint of child abuse, with its myriad levels of intensity with victims with myriad degrees of vulnerability to the abuse, beyond asking if there is sufficient evidence of causality and permanence to allow it to go to the jury. It follows from the principle of law that the *Penry* trigger requires a permanent, not transient condition that the jury must be told of this principle to enable it to resolve conflicting evidence of permanence tendered in mitigation. And this surely follows from *Apprendi*'s stanching of the shrinking of the role of the jury,[28] as in *Cabana v. Bullock*.

---

[28] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

We need not subscribe to jury nullification to accept the reality that our efforts to define what is mitigating, to guide the discretion of the jury, has inherent limits. What is sufficiently mitigating will find its ultimate meaning in the collective judgment of the jury verdict – a core meaning that does not transcend cases but has meaning only for the defendant in the dock. That is no more than the realization of the principle that the accused is to be judged as an individual. And to be faithful to that principle the judicial and legislative hand must accept that reality. Consistent with *Apprendi*, if the jury's decision of life or death is not to be trusted with some genre of criminal activity, the solution is to not make it a capital crime. It is not to attempt to guide or remove from jury discretion more than we have already.

I must disagree with the majority's summary dispatch of the second wing of the issue that brought this case to the en banc court, that *Penry* aside, the nullification instruction impeded the jury's consideration of Robertson's mitigating evidence.

As the *Boyde* court put it: "[T]he proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents consideration of constitutionally relevant evidence."[29] And to the

---

[29] *Boyde v. California*, 494 U.S. 370, 380 (1998).

point, "constitutionally relevant evidence" here includes all mitigating evidence.

To be sure, Robertson faces a tough standard in pressing this contention. The court footed this standard firmly in the reality of a trial, warning against legalistic post-verdict parsing of the charge and insisting that its adequacy be judged in its full setting. I am ultimately not persuaded by this contention, but it is not without force, and I come to this conclusion only after reading the charge and the closing arguments many times. The jury was instructed that "some mitigating evidence, if any, may not be relevant to resolving the special issues but may be relevant in determining whether or not the defendant should be put to death." The jury was next told "if they have answered yes to the questions believing that the state has proved beyond a reasonable doubt that the answers to the special issues are yes and also believe from the mitigating evidence, if any, that the defendant should not be sentenced to death, that they should answer no." Because there was no *Penry* mitigating evidence, answering whether Robertson would probably be dangerous in the future, would give Robertson's mitigating evidence all the effect it was constitutionally due. The trial court and every court thereafter through the remand to the panel by the Supreme Court proceeded on the assumption that *Penry* evidence had been presented and the nullification instruction

40

was needed, or at least that its need was sufficiently uncertain that it was prudent to give it. And of course the case was argued to the jury in that manner: that the jury should answer the questions and if it had answered them yes it should then change a yes answer to a no if it thought any mitigating evidence led them to doubt that the death penalty should be imposed. Asking the jury to separate its consideration of mitigating evidence and future dangerousness is confusing because it is in answering the question that the jury is to consider mitigating evidence. This mixture of legal doctrines in context, however, did not to my mind pose a reasonable likelihood that the jury was unable to give expression to Robertson's evidence, despite the fog it brought to the courtroom. I reach this conclusion because the common sense of the jury is deployed here free of the burdens of the legal distinctions driven by our efforts to balance the twin and conflicting ends of *Furman*[30] – even-handed treatment across cases in which each accused receives individualized consideration of his mitigating circumstances.

---

[30]   408 U.S. 238 (1972).

HAROLD R. DEMOSS, JR., Circuit Judge, DISSENTING:


The majority opinion stands essentially on two premises: first, that the decision of the Supreme Court in <u>Penry v. Johnson</u>, 129 S. Ct. 1910(2001)("<u>Penry II</u>") does <u>not</u> "shed any light" on our decision here in <u>Robertson</u>; and second, under our "consistently applied" Fifth Circuit case law interpreting the Supreme Court decision in <u>Penry v. Lynaugh</u>, 109 S. Ct. 2934(1989)("<u>Penry I</u>") Robertson's mitigating evidence fails to pass the test in "quality and quantity" of "Penry type mitigating evidence" and the supplemental instruction on mitigating evidence and the nullification instruction actually submitted to the trial court in Robertson's trial can be ignored. Because I am convinced that both of these premises are erroneous, I respectfully dissent and write to explain my reasons why.

## THE PENRY I CONNECTION

In June of 1989, the Supreme Court of the United States handed down its decision in "Penry I" which reversed the affirmance of Penry's death sentence by this Circuit Court, and the federal district court, in federal habeas proceedings. The Supreme Court stated:

> 1. "The jury was never instructed that it could consider the evidence offered by Penry as <u>mitigating</u> evidence and that it could give <u>mitigating</u> effect to that evidence in imposing sentence." *Id*. at 2947; and,

2. "The state conceded at oral argument in this Court that if a juror concluded that Penry acted deliberately and was likely to be dangerous in the future, but also concluded that because of his mental retardation he was not sufficiently culpable to deserve the death penalty, that juror would be unable to give effect to that mitigating evidence under the instructions given in this case." *Id.* at 2951.

The Supreme Court then held:

"In this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Id.* at 2952.

In July of 1990, John Paul Penry was retried before a jury in Texas state criminal district court. He was again convicted of capital murder and the jury again assessed his punishment as death. This case was automatically appealed to the Texas Court of Criminal Appeals. In February of 1995, that Court handed down its decision at 903 S.W. 2d 715 (Tex. Crim. App. 1995). One of the points of error raised in Penry's appeal was that "the trial court submitted an improper jury instruction on mitigating evidence." *Id.* at 764. In overruling this point of error and affirming his death penalty, the Court of Criminal Appeals stated:

However, defendants occasionally proffer mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues. Penry v. Lynaugh, 492 U.S. at 329, 109 S.Ct. at 2952. In such a case, the jury must be given a special instruction in

43

order to allow it to consider and give effect to such evidence. *Id.* The trial court in the instant case submitted the following charge:

> You are instructed that when you deliberate on the questions posed in the Special Issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

We have already held that a nullification instruction such as this one is sufficient to meet the constitutional requirements of <u>Penry v. Lynaugh</u>. <u>Coble v. State</u>, 871 S.W. 2d 192, 206-207 (Tex. Crim. App. 1993), <u>cert. filed</u>.

903 S.W.2d at 765.

John Paul Penry then sought state habeas relief, which was denied and then filed for a federal habeas corpus relief after the enactment of the Antiterrorism and Effective Death Penalty Act("AEDPA"). In both the federal district court and in our Court, Penry contended that the instruction given by his state trial court

44

quoted above did not satisfy the requirements of Penry I; but in Penry v. Johnson, 215 F.3d 504, 508-09 (5th Cir. 2000), our Court held as follows: "We agree with the district court that the Texas Court of Criminal Appeals's holding that the challenged instruction was constitutional was not an unreasonable application of clearly established law, namely Penry I."

John Paul Penry applied for a writ of certiorari to the U.S. Supreme Court which was granted and in June of 2001, the Supreme Court issued its decision in "Penry II".[31]  In Penry II, the Supreme Court made a variety of comments which are pertinent to our discussion in this case.  First of all, the Supreme Court in Penry II pointed out explicitly what its holding in Penry I did and did not hold:

> *Penry I* did not hold that the mere mention of 'mitigating circumstances' to a capital sentencing jury satisfies the Eighth Amendment.  Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may 'consider' mitigating circumstances in deciding the appropriate sentence. Rather, the key under Penry I is that the jury be able to 'consider and give effect to [a defendant's mitigating] evidence when imposing sentence.' 492 U.S. at 319, 109 S. Ct. 2934 (emphasis added).  For it is only when the jury is given

---

[31]The Supreme Court decision in Penry II is the first occasion on which the Supreme Court addressed compliance by Texas trial courts in capital cases with the mandates of Penry I.  More particularly, the decision in Penry II is the first occasion on which the Supreme Court addressed the sufficiency of a supplemental instruction on mitigation and a "nullification instruction" as employed by the Texas trial courts.

45

a 'vehicle for expressing its reasoned moral response' to that evidence in rendering its sentence decision <u>Penry I</u> 492 U.S. at 328, 109 S. Ct. 2934, that we can be sure that the jury has treated the defendant as an uniquely individual human being and has made a reliable determination that death is the appropriate sentence.

121 S. Ct. at 1920 (citation omitted).

From these comments of the Supreme Court in <u>Penry II,</u> it seems absolutely clear that the Supreme Court is telling us that <u>Penry I</u> requires not only that the jury must consider mitigating evidence, but also that there must be a vehicle by which the jury can give effect to that mitigating evidence if it so chooses.

Likewise it is equally clear from the Supreme Court's language in <u>Penry II</u> that the "nullification instruction" employed in John Paul Penry's retrial does not pass muster constitutionally as such a vehicle by which the jury can express its consideration of mitigating evidence. In support of this conclusion, I point out the following statements by the Supreme Court in <u>Penry II</u>:

1. "Rather it [the "nullification instruction"] made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation." *Id.* at 1921.

2. "The supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Id.* at 1922.

46

3. "While these comments reinforce the State's construction of the supplemental instruction, they do not bolster our confidence in the jurors' ability to give effect to Penry's mitigating evidence in deciding his sentence. Rather, they highlight the arbitrary way in which the supplemental instruction operated, and the fact that the jury was essentially instructed to return a false answer to a special issue in order to avoid a death sentence." *Id*. at 1923.

4. "Although the supplemental instruction made mention of mitigating evidence, the mechanism it purported to create for the jurors to give effect to that evidence was ineffective and illogical." *Id*. at 1924.

5. "Any realistic assessment of the manner in which the supplemental instruction operated would therefore lead to the same conclusion we reached in Penry I: '[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence.'" *Id.*

6. "Thus to the extent the Texas Court of Criminal Appeals concluded that the substance of the jury instructions given at Penry's second sentencing hearing satisfied our

47

mandate in <u>Penry I</u>, that determination was objectively unreasonable." *Id.*

The last quotation from <u>Penry II</u> is critically material to our decision here in <u>Robertson</u> because the real issue before us is whether the decision of the Texas Court of Criminal Appeals, which held that the supplemental instructions given at Robertson's penalty phase hearing before the state trial court were consistent with the constitutional requirements in <u>Penry I</u>, can be now affirmed in light of <u>Penry II</u>.

## **APPLICABILITY TO ROBERTSON**

In January of 1991, Mark Robertson was convicted of the offense of capital murder by a jury in the state district court of Dallas County; and after the same jury affirmatively answered the two statutory special issues submitted to it, the court sentenced Robertson to death in February 1991. At Robertson's punishment hearing, a supplemental instruction was given to the jury by the state district court. The complete text of this supplemental instruction is set forth as footnote 3 in the majority opinion *supra*; and for clarity sake, I will refer to the first two paragraphs of that footnote 3 as the supplemental instruction on mitigation (hereinafter referred to as "SIOM") and the third paragraph of that footnote 3 as the nullification instruction (hereinafter referred to as "NULI"). It is not clear from the

48

state trial record in Robertson's case precisely where and how the SIOM and NULI came to be used in Robertson's trial. It is absolutely clear, however, that the state prosecutor raised no objection to the use of either of the SIOM or the NULI. On the other hand, Robertson's defense counsel interposed a clear objection to the use of the NULI because it did not provide a sufficient vehicle for the jury to use in expressing its views on mitigating evidence as required by <u>Penry I</u>. Defense counsel for Robertson also proffered a separate jury issue to be submitted, in addition to the statutory issues on punishment, which was very similar in language and content to the statute which the Texas Legislature adopted later on in its 1991 Session and made effective as of September 1, 1991.[32] The state district court overruled Robertson's objection to the NULI and rejected the proffer of the separate special issue on mitigation.

Because I think the textual content of the SIOM and the NULI used in Robertson's trial are critically important to a determination of the ultimate issue which we address in this appeal, I want to highlight some of the aspects of these instructions. First of all, note that the SIOM states that the jury "shall consider" (not "may consider") any evidence which in

---

[32]This new statute is quoted in full in footnote 4 on page 13 of the majority opinion *supra*.

49

the jury's opinion is "mitigating." The instruction gives a definition of mitigating evidence, which is broad but includes "an aspect of the defendant's character, record, background, or circumstances of the offense for which you have found him guilty." The SIOM goes on to advise the jury that "[o]ur law does not specify what may or may not be considered as mitigating evidence;" and that the members of the jury "are the sole judges of what evidence, if any, is mitigating and how much weight, if any, is mitigating and how much weight, if any, including those which have no relationship to any of the special issues deserves." Finally, the SIOM in Robertson's case instructs the jury that they may find some evidence to be mitigating even though it "has no relationship to any of the special issues;" and that some evidence "may not be relevant to resolving the special issues but may be relevant in determining whether or not the defendant should be put to death."

The language and content of the SIOM in Robertson's case strikes me as a good faith effort to satisfy the mandate from the Supreme Court in Penry I that the jury be instructed to "consider" all mitigating evidence. The majority seems to intimate that the SIOM goes further in permitting consideration of mitigating evidence than was constitutionally required. However, as I pointed out earlier, the prosecutor raised no objection of any kind whatsoever to the trial court's use of this SIOM. And that leads

me to conclude that at the time of Robertson's trial in January of 1991, the state's prosecutors did not read Penry I as requiring any particular "quantity or quality" of mitigating evidence as a threshold before the Penry I mandate would come into play.

In regard to the NULI in Robertson's case, it is very similar in concept, though not identical in language, to the nullification instruction used in the retrial of Penry. Both are structured on the premise that for the jury to give effect to its conclusion that life in prison is a more appropriate punishment than death, the jury must give a false "no" answer to one of the statutory special issues to which it has already answered "yes." As the Supreme Court explicitly concluded in Penry II, such a "vehicle" is constitutionally not acceptable.

Robertson's conviction and death sentence were automatically appealed to the Texas Court of Criminal Appeals which affirmed Robertson's conviction and death sentence in a published opinion, Robertson v. State, 871 S.W. 2d 701 (Tex. Crim. App. 1993), and was issued on December 8, 1993. Among other errors asserted on this appeal, Robertson complained that the trial court erred in failing to submit a special issue concerning mitigation which he proffered rather than the "nullification" charge actually given; and that the judgment of the trial court is unconstitutional because the jury was not given an adequate vehicle to express their personal moral

51

reasoned response to appellant's culpability as required by Penry I. In rejecting these complaints, the Texas Court of Criminal Appeals (1) relied on an earlier decision in Fuller v. State, where the Court held that a "nullification charge was adequate to avoid the constitutional infirmity condemned by Penry"; and, (2) stated that "[t]he Supreme Court has not required that a particular vehicle be employed to allow for the jury's consideration of mitigating evidence, only that the jury be provided with a vehicle." 871 S.W. 2d at 710-711. Thereafter, Robertson's application for a writ of certiorari to the United States Supreme Court was denied on October 3, 1994. Robertson v. Texas, 115 U.S. 155 (1994).

In April of 1997, Robertson filed his application for state habeas corpus in the same court that had convicted and sentenced him. Among other grounds of relief sought by Robertson in his state habeas petition, the sixth ground stated:

> whether the trial court's submission of a nullification instruction instead of a Penry special issue violated the Eighth and Fourteenth Amendments to the United States Constitution.

The same state judge who presided at Robertson's original trial handled the state habeas proceeding, conducted a hearing and entered extensive findings of fact and conclusions of law. In rejecting Robertson's contentions about the sixth ground of error,

52

the state habeas judge entered the following paragraphs in his order:

> 82. The Court notes that applicant's attorneys at trial requested a separate instruction regarding mitigating circumstances. (Tr.:282). This request was denied by this Court. (Tr.:282; R.LXV:59). Instead, this Court submitted a nullification instruction to the jury regarding mitigating evidence that instructed the jurors to answer one of the special issues "no" if they felt that mitigating circumstances warranted a life sentence rather than the death penalty. (Tr.:313-314). On direct appeal the Court of Criminal Appeals ruled that this "nullification" charge was sufficient to meet the commands of Penry because it provided the jury with a vehicle to allow consideration of mitigating evidence. Robertson, 871 S.W.2d at 711. As support for its ruling, the Court of Criminal Appeals cited Fuller v. State, 829 S.W.2d 191, 209 (Tex. Crim. App. 1992), cert. denied ___ U.S. ___, 113 S. Ct. 2418, 124 L.Ed.2d 640 (1993).

> .....

> 84. The Court finds that the nullification charge given to the jury in the punishment phase of applicant's trial allowed the jury to consider any mitigating evidence in assessing the death penalty because it instructed the jury to consider mitigating evidence if there was any, it explained the nature of mitigating evidence, and it authorized the jury to answer one of the special issues "no" if the jury felt that there was sufficient mitigating evidence to warrant a sentence of life imprisonment rather than a death sentence. The Court therefore concludes as a matter of law that the charge given meets the requirements of Penry, and this Court's refusal to give a separate mitigation issue did not violate the Eighth and Fourteenth Amendments.

The Court's Findings of Fact and Conclusions of Law, filed June 26, 1998, District Court No. 5, Dallas County, Texas.

In an appeal of the state habeas ruling, the Texas Court of Criminal Appeals, affirmed Robertson's conviction and sentence,

53

without a published opinion, for the reasons stated by the state habeas district court.

In November, 1998, Robertson filed a petition for federal habeas corpus relief pursuant to 28 U.S.C. §2254. Among other grounds for relief Robertson again alleged that the trial court submission of a nullification instruction and refusal to create a third special issue on the effect of mitigating evidence constituted constitutional error. Robertson's petition was referred to a magistrate judge for report and recommendation and in March, 2000, the magistrate judge recommended that Robertson's petition be denied and dismissed. With regard to Robertson's claims about the use of the nullification instruction and the trial court's refusal to create a third special issue on the effect of mitigating evidence, the magistrate concluded that Robertson could not demonstrate that the decisions of the state courts in approving those actions were "contrary to or involved an unreasonable application of clearly established federal law as decided by the United States Supreme Court." The federal district court adopted the magistrate judge's recommendations and dismissed Robertson's petition. The district court also denied Robertson's request for a certificate of appealability (COA) and Robertson moved our Court for grant of a COA on several grounds. One of the issues on which Robertson sought COA from this Court was that the trial court's

54

decision to instruct the jury that it could answer one of the statutory special issues "No" (thus precluding the assessment of the death penalty) if persuaded that mitigating evidence made the death penalty inappropriate, combined with the trial court's refusal to give the jury a third special issue expressly addressing the effect of mitigating evidence, violated his Eighth and Fourteenth Amendment rights as set forth in Penry I v. Lynaugh. This Court denied Robertson's request for COA on this issue because he failed to identify any portion of Penry I or any other applicable Supreme Court authority that would render the approach taken by the Texas Courts in general or his state habeas court in particular, contrary to or an unreasonable application of clearly established federal law.

Robertson then petitioned the Supreme Court of the United States for a writ of certiorari. On July 17, 2001, the Supreme Court granted the writ of certiorari, vacated the decision of this Court and remanded Robertson's case "to the United States Court of Appeals for the Fifth Circuit for further consideration in light of Penry v. Johnson, 532 U.S. 782 (2001) (Penry II)." On remand from the Supreme Court the original panel determined that there was no substantial difference between the nullification instruction in Penry II and the nullification instruction in Robertson and therefore that the decision of the Supreme Court in Penry II

55

required us to grant Robertson's request for COA on that issue and vacate the district court's judgment denying Robertson's application for a federal writ of habeas corpus and remand Robertson's case to the district court with instructions to grant Robertson's habeas corpus relief unless the State of Texas, within a reasonable time, granted Robertson a new trial on the issue of punishment. A majority of this Court voted to reconsider that panel opinion *en banc*.

## WHAT WE NEED TO DECIDE

The majority opinion has difficulty in describing precisely what we should be deciding on the *en banc* reconsideration of Robertson's appeal. They furnish us with three iterations of the critical issues in this case:

A. "This case constitutes a test, first, of the circumstances under which the Texas special issues might fail to facilitate a sentencing jury's consideration of mitigation evidence and, second, of the supplemental instruction's ability to cure such a failure." Supra, at lines 39-42.

B. "The case at bar constitutes a test of the evidence-both in quality and quantity-that provokes such a failure." Supra, at lines 223-224.

56

C.    "The first question before this court is whether the Texas special issues failed to provide Robertson's sentencing jury with an appropriate vehicle to give mitigating effect to his evidence of childhood abuse and substance abuse.    Based on this court's consistent interpretation of <u>Penry I</u>, we hold that the statutory special issues alone were adequate to allow the jury to give effect to Robertson's mitigating evidence." <u>Supra</u>, at lines 295-301.[33]

With all due respect to my colleagues in the majority, these are the wrong questions which elicit the wrong result based on the wrong precedent.

In framing these questions as it does, the majority makes clear its preoccupation (which borders almost on an obsession) with (i) exploring the "quantity and quality" of Robertson's mitigating

---

[33]In addition to a great host of Fifth Circuit cases, the majority cites four Supreme Court cases in support of its reasoning and conclusions:  <u>Jurek v. State of Texas</u>, 428 U.S. 262 (1976); <u>Franklin v. Lynaugh</u>, 487 U.S. 164 (1988); <u>Graham v. Collins</u>, 506 U.S. 461 (1993); and <u>Johnson v. Texas</u>, 509 U.S. 350 (1993).  All of these Supreme Court decisions dealt with criminal cases that were tried in the state district courts before the decision by the Supreme Court in <u>Penry I</u>.  Neither <u>Jurek</u> nor <u>Franklin</u> nor <u>Graham</u> involved any kind of supplemental instruction on mitigation nor any kind of nullification instruction.  <u>Johnson</u> did not contain any form of nullification instruction; but it did contain a very "bobtail" form of supplemental instruction which simply advised the jury that in considering the special issues, they could consider evidence they heard during trial, be it mitigating or aggravating in nature."  509 U.S. at 355.

57

evidence (ii) in order to compare Robertson's mitigating evidence with Penry's mitigating evidence for the purpose of (iii) deciding that the Texas Statutory Special Issues were sufficient by themselves to permit the jury to "consider and give effect to" Robertson's mitigating evidence (iv) without the need "for the supplemental instruction on mitigation and the nullification instruction."[34] In my view, the majority's conceptual analysis is flawed for the following reasons:

1. There has never been any debate, controversy, or issue, either in the state trial court or in the Texas Court of Criminal Appeals or in the state habeas court, as to the sufficiency of Robertson's mitigating evidence to require, under Penry I, that something more than the statutory special issues be given to the jury in regard to mitigating evidence. The state prosecutor made no objection whatsoever to the giving of the SIOM and NULI as they were actually given at Robertson's trial.

2. In effect, the text of the SIOM and the NULI removes from the table any controversy about the "quantity and quality" of Robertson's mitigating evidence. The jury was expressly instructed that it was the sole judge of

---

[34]In their enthusiasm to limit the applicability of Penry I, the majority states:

"Penry I required such a vehicle only with regard to evidence of mental-retardation-induced impulse-controlled deficiency." Supra, at line 310 on page 17.

A computer check of the text of the Penry I opinion reveals that the word "only" is never used in any phrase which purports to say when a "vehicle" is required. Likewise, the majority's use of the word phrase "mental-retardation-induced impulse-controlled deficiency" never appears at all in Penry I.

what constituted mitigating evidence and that the jury could determine that some evidence had a mitigating effect even though that evidence had no relevance to the jury's answer to either one of the two statutory special issues.

3.   When the Texas Court of Criminal Appeals affirmed the trial court's use of the SIOM and the NULI, that Court did so on the basis that those additional instructions were required by the language of the Supreme Court in Penry I and the content of those instructions satisfied the mandates of Penry I.

4.   Finally, I think the majority errs in relying on whatever may be "this Court's consistent interpretation of Penry I to decide the critical issues in this case."  After Congress adopted AEDPA, it is settled law that on our review under §2254 we look only to decisions of the United States Supreme Court to determine whether a state court decision was consistent with "clearly established federal law."  The only Supreme Court decision which the state district trial court, the Texas Court of Criminal Appeals, and the state habeas court looked to in determining the validity or not of the use of the SIOM and NULI in Robertson's case was the decision of the U.S. Supreme Court in Penry I; and none of those courts cited as authority any of the Fifth Circuit cases which the majority lists in its compendious footnotes about our circuit's "consistent interpretation of Penry I."

**THE REAL QUESTIONS**

In my judgment the two critical issues for decision before this *en banc* court are:

1.   Did either of the three rulings of the state district court, the Texas Court of Criminal Appeals or the state habeas court, each of which approved the submission of the SIOM and the NULI to Robertson's jury in the penalty phase, constitute "a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States" in Penry I?

59

2.  In making the foregoing determination, what effect, if any, do we give to the holding of the Supreme Court in <u>Penry II</u> that similar rulings by the state courts in a similar case were objectively unreasonable as defined in AEDPA?

Because I'm truly amazed at the cavalier manner in which the majority dismisses the applicability of the Supreme Court holding in <u>Penry II</u> to the decision making in this case, I want to address the second question first. When the Supreme Court remands a case to our Court with instructions to reconsider that case "in light of" the decision of the Supreme Court in another recent case, I think we are duty bound to: (i) make sure we understand what portion of that other recent case "sheds light on" the case being remanded and (ii) apply that portion in our reconsideration. That is particularly true under the circumstances of Robertson's case. The panel opinion for which Robertson sought a writ of certiorari to the Supreme Court had denied Robertson's motions for a certificate of appeability on all issues, including specifically the issue about the supplemental instruction on mitigation evidence, because we concluded that the state courts had correctly determined that those supplemental instructions satisfied the requirements of <u>Penry I</u>. The Supreme Court granted certiorari and vacated that panel decision. From just those actions I have to conclude that the Supreme Court is telling us we reached the wrong result in the panel decision. And, when the Supreme Court vacates

and remands this case to us, I am amazed that our *en banc* Court would have the audacity to turn around and reach the same result the Supreme Court just vacated.

Under the heading "The Trial Court's Presentation Of The Supplemental Instruction Does Not Constitute Error Reversible or Otherwise" <u>Supra</u>, at lines 595-596, the majority disposes of the applicability of the Supreme Court's decision in <u>Penry II</u> to the circumstances here in <u>Robertson</u> with two very conclusionary statements:[35]

1. "The concerns that motivated the Supreme Court in <u>Penry II</u> are not present in the case at bar." <u>Supra</u>, at lines 628-629.

2. "Absent the quality and quantity of mitigating evidence necessary to raise a <u>Penry</u> claim, we decline to find that recitation of the supplemental instruction to Robertson's jury constitutes error of any sort." <u>Supra</u>, at lines 642-645.

Both of these conclusionary statements simply ignore that portion of the Supreme Court decision in <u>Penry II</u> which, in my judgment is most relevant and significant to our decision making in <u>Robertson</u>:

"Thus, to the extent the Texas Court of Criminal Appeals concluded that the substance of the jury instructions given at Penry's second sentencing hearing satisfied our

---

[35]In its enthusiasm to limit the applicability of <u>Penry II</u>, the majority states: "In <u>Penry II</u>, the Court professed only to reiterate the holding of <u>Penry I</u>." Citing 532 U.S. at 797. I have scoured page 797 and there is nothing thereon that can be reasonably construed as a "profession" by the Supreme Court in <u>Penry II</u> that it is "only reiterating" its holding in <u>Penry I</u>.

61

mandate in Penry I, that determination was objectively unreasonable. ... Although the supplemental instruction made mention of mitigating evidence, the mechanism it purported to create for the jurors to give effect to that evidence was ineffective and illogical."

121 S. Ct. at 1923.

If the conclusions of the Texas Court of Criminal Appeals were "objectively unreasonable" in Penry II then I can see no basis for arriving at an opposite conclusion here in Robertson. The similarities between the original state court trials in both Penry II and Robertson are legion:

1. Both cases were tried in state court after the decision of the U.S. Supreme Court in Penry I and before the effective date of the new statutory provision adopted by the Texas Legislature in September, 1991;

2. In each case a supplemental instruction on mitigation which included a nullification instruction was submitted to the jury without objection by the state prosecutor;

3. In both cases, the nullification instruction required the jury to "return a false answer to a special issue in order to avoid a death sentence;"

4. In both cases, the state courts determined that the use of the supplemental instruction and the nullification instruction were consistent with the mandates of the Supreme Court in Penry I;

5. In neither case did the state courts rely upon or even consider the "quality and quantity" of the mitigating evidence as a factor in deciding to submit the supplemental instruction or the nullification instruction; and,

6. In neither case did the state courts rely upon any cases decided by the Fifth Circuit as precedential authority

62

for their decision to submit the supplemental instruction and the nullification instruction.

Given these similarities it is a simple and easy call for me to say that in "light of the Supreme Court holding in <u>Penry II</u>," the state courts decisions here in <u>Robertson</u>, that concluded that the use of the supplemental instruction and the nullification instruction in Robertson's trial were consistent with the mandate of the Supreme Court in <u>Penry I</u>, were likewise objectively unreasonable; and the holding in <u>Penry II</u> to that effect is applicable and controlling here in <u>Robertson</u>.  In my view, the majority errs grievously in relying upon other Fifth Circuit decisions in other state habeas cases under §2254 in which the original state criminal trials occurred before the date of the Supreme Court holding in <u>Penry I</u> and in which there were neither a supplemental instruction on mitigation nor a nullification instruction actually given.

In reaching this conclusion, I have no intention of casting aspersions of any kind on the body of Fifth Circuit case law which started with our *en banc* decision in <u>Graham v. Collins</u>, 950 F.2d 1009 (1992) and has been construed, applied, and extended as described in the majority opinion.  <u>Graham</u> and many of its progeny clearly involved a death penalty case tried in a Texas court before the Supreme Court decision in <u>Penry I</u> and in which no supplemental instruction on mitigation or nullification instruction was submitted to the jury.  In my view <u>Graham</u> and its progeny have no

63

application to death penalty trials like Robertson's which took place after the Supreme Court's decision in Penry I and which contained express supplemental instructions on mitigation and nullification instructions. Conversely, for the same reasons I do not read the Supreme Court decision in Penry II as having any impact on Graham and its progeny.

## CONCLUSION

For the foregoing reasons I respectfully dissent from the holding and the analysis expressed by the majority. I would follow the lead of the Supreme Court in Penry II and vacate the decision of the district court denying Robertson's petition for habeas corpus relief and remand the case to the district court with instructions to grant such relief unless the State of Texas grants Robertson a retrial of his punishment issues or reduces his sentence to one less than death.

ENDRECORD

64

_____

CARL E. STEWART, Circuit Judge, DISSENTING:

I agree with the thrust of Judge DeMoss's and Judge Dennis's dissents; however, I write separately in order to clarify my perspective on this difficult case. The facts at issue are adequately set out in the majority opinion and the dissenting opinion by Judge DeMoss. I will not recite them here.

The nullification instruction at the core of our review in this case is nearly identical to the nullification instruction at issue before the Supreme Court in Penry v. Johnson, 532 U.S. 782 (2001) (Penry II). The Supreme Court, in Penry II explained that the nullification instruction "was objectively unreasonable." 532 U.S. at 804. In Penry v. Lynaugh, 492 U.S. 302 (1989) (Penry I), the Supreme Court held that "Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence." 532 U.S. at 786 (citing Penry I, 492 U.S. 302 (1989)). The majority reads the Supreme Court's decisions in Penry I and Penry II, to require a separate threshold analysis of the quality and quantity of mitigating evidence before considering the infirm instruction. In so doing, the majority missed the core of the analysis in the Penry cases and based its conclusions on what it considers to be the Supreme Court's silence. In the Penry decisions, the Supreme Court was clear, however, that it is for the jury, not this Court, to evaluate the quality and quantity of mitigation evidence in the sentencing phase of a capital trial. For this reason, I respectfully dissent from the majority opinion.

In Robertson, the State concedes that "under Penry II, the state courts' conclusion that the supplemental instruction satisfied Penry I is objectively unreasonable."[36] The Penry II Court explained that the nullification instruction at issue was inadequate to correct the constitutional violation of Penry I because it "provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." Penry II, 532 U.S. at 800. To analyze the constitutional infirmity here, the Supreme Court instructs this Court to determine only whether the nullification instruction provided an adequate "vehicle for the jury to make a reasoned moral response" to Robertson's mitigating evidence. Neither conclusion requires this Court to first speculate whether as a matter of law, the mitigating evidence will have a negating effect on the jury. The Supreme Court has been clear that the nullification instruction at issue is objectively unreasonable to meet the standard of providing an adequate vehicle for the jury to consider mitigation evidence. Nonetheless, the majority contends that because the Supreme Court has been silent regarding any analytical requirement beyond the specific facts involved in Penry I, our court is free to derive from Penry I an additional step in the analysis. The majority then inserts this additional step into the Supreme Court's analysis in Penry II, and determines that this Court must filter the mitigating evidence presented before it reaches the jury.

---

[36] In its Brief for Janie Cockrell on Remand From the United States Supreme Court in light of Penry v. Johnson, the State explains that the state court determined that Robertson's Eighth Amendment rights were not violated "approving the supplemental instruction as an adequate vehicle" citing Penry I. The State then conceded: "It is now true that under Penry II, the state courts' conclusion that the supplemental instruction satisfied Penry I is objectively unreasonable." Appellee's Brief at 12.

It is not for this Court to stand in the shoes of the jury in the sentencing phase of a capital trial and determine the quality and quantity of the mitigation evidence placed before them. It is our responsibility, however, to ensure that "the jury is given a 'vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision.'" Penry II, 532 U.S. at 797 (quoting Penry I, 492 U.S. at 328). When we do so, "we can be sure that the jury 'has treated the defendant as a uniquely individual human being' and has made a reliable determination that death is the appropriate sentence.'" Id. By determining that Robertson's evidence of childhood abuse was not significant enough to mitigate a sentence of death, we are sua sponte writing between the lines of Penry II, thereby neglecting our primary responsibility made clear in Penry II – i.e., to ensure that the jury is able to give "a reasoned moral response to that evidence." Id.

The majority seeks to prevent the jury from determining whether Robertson's childhood abuse is mitigating and whether to give it any weight in sentencing. In concluding that the nullification instruction at issue "provided an inadequate vehicle for the jury to make a reasoned moral response to Pentry's mitigating evidence," the Supreme Court noted "the jury's ability to consider and give effect to Penry's mitigating evidence was still 'shackled and confined within the scope of the three special issues.'" Penry II, 532 U.S. at 798-800 (quoting Penry, 215 F.3d at 514 (Judge Dennis dissenting)). The standard for evaluating Robertson's claim of error in the giving of the nullification instruction is, "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[s] the consideration of constitutionally relevant evidence." Id. at 800 (quoting Boyde v. Cal., 494 U.S. 370, 380 (1990) (emphasis added)). This standard includes all mitigating evidence, not merely the special variety which the majority maintains

can give rise to a Penry error. As the Supreme Court has instructed, "the Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence." Boyde, 494 U.S. at 377 (explaining that the California jury instruction at issue did not preclude consideration of all non-crime-related evidence). It is not up to the Court to determine the strength of the mitigating evidence, the Court's only responsibility is to ensure that the instructions did not prevent the jury from considering the evidence. Yet, the majority has done just that.

By first determining that the objectively unreasonable nullification instruction posed no error because Robertson's evidence does not rise to the level of so-called "Penry-quality mitigating evidence," the majority is preventing the jury from adequately considering the evidence. The jury charge in this case, as in Penry II, with the inclusion of the nullification instruction was so confusing that "[t]here is at the very least, 'a reasonable likelihood that the jury ... applied the challenged instruction in a way that prevent[ed] the consideration'" of Robertson's mitigating evidence. Penry II, 532 U.S. at 800. Neither in Penry I nor in Penry II, did the Supreme Court instruct that it is within the province of a reviewing or trial court to first speculate, before jury deliberations, whether the mitigating evidence presented by the Defendant during the sentencing phase of a capital trial is powerful enough to negate the jury's findings. We should not gut Penry II by ignoring the nullification instruction issue in Robertson which the Supreme Court remanded to this Court and by considering only the evidence presented in Penry I.

Nowhere in its analysis of the nullification instruction in the Penry cases did the Supreme Court balance the mitigating evidence against the aggravating factors presented before the jury as the majority is want to do here. The majority distinguishes Robertson's evidence by presenting the

68

proposition that because there is a so-called causal relationship between Penry's mental retardation and extreme childhood abuse, this mitigating evidence is stronger than Robertson's.[37] Notwithstanding that the Supreme Court never based its analysis on a causal relationship between Penry's childhood abuse and his mental retardation, the type of the mitigating evidence is inapposite to the analysis. The mere fact that there is mitigating evidence is what prevails. See Williams v. Taylor, 529 U.S. 362 (2000).

The majority fails to acknowledge that since Penry I, the Supreme Court has more clearly defined the contours of a defendant's constitutional right to present mitigating evidence during the sentencing phase of trial. See Williams v. Taylor, 529 U.S. 362 (2000). In Williams, "Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody." 529 U.S. at 395. In Williams, the Supreme Court considered Williams's mitigating evidence so significant to the sentencing process of his capital murder trial, that the Supreme Court upheld his ineffective assistance of counsel claim against his attorney for not

_____

[37] Although there is some indication in the recitation of facts in Penry I that his mental retardation may have been caused by a traumatic blow to his head as a child, the Supreme Court consistently separates Penry's mental retardation from his childhood abuse in its analysis in both Atkins and Penry II. See Atkins v. Virginia 122 S.Ct. 2242, 2244 (2002) ("[I]n the 13 years since we decided Penry I, the American public, legislatures, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal."); Penry II, 532 U.S. at 787 ("Penry had offered extensive evidence that he was mentally retarded and had been severely abused as a child.").

69

presenting evidence of his abusive childhood as mitigating evidence for the jury to consider. Id. In Williams, the Supreme Court was not concerned with whether the childhood abuse resulted in mental illness. Rather than engage in the process of balancing the gravity of the mitigating evidence against the aggravating factors, the Supreme Court was only concerned that the jury was prevented from considering such evidence in the sentencing phase of the capital trial by defense counsel.

The theme of the majority's opinion is that Penry II only applies to a similar type of mitigating evidence premising it on the fact that Penry was mentally retarded. Even if the type of mitigating evidence matters to the analysis, the Supreme Court has been slowly chiseling away classes of Defendants eligible for capital punishment. The first analytical comment the Supreme Court espoused on Penry's mental retardation was in Atkins v. Virginia. 122 S.Ct. 2242, 2244 (2002) ("[I]n the 13 years since we decided Penry I, the American public, legislatures, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal."). In Atkins, the Supreme Court held that imposing the death penalty on the mentally retarded is in violation of the Eighth Amendment. Id. at 2252. If we take as correct the majority's interpretation that Penry II applies only in circumstances where the mitigating evidence is abuse that results in mental retardation or similar mental aberration, then Penry II cannot be applied in any capital sentencing context consistent with Atkins v. Virginia, 122 S.Ct. 2242 (2002). Surely, this is not the outcome the Supreme Court intended when it decided Atkins. If this were true, then Atkins stands to overturn Penry II, unless Penry I and Penry II are interpreted to broadly include independent evidence of childhood abuse.

70

The decision in <u>Penry II</u> and the State's concession conclusively show that the nullification instruction at issue in Robertson's trial did not give the jury an appropriate vehicle to consider his mitigation evidence. The majority errs in failing to heed the essence of the Supreme Court's remand to this Court and is perpetuating the effects of the constitutionally problematic jury charge. For these reasons I respectfully dissent.

ENDRECORD

DENNIS, Circuit Judge, dissenting:


Because today's decision is counter to the explicit commands of the Supreme Court in Penry v. Lynaugh, 492 U.S. 302 (1989) (Penry I), and is inconsistent with the logic which underlies that decision, I respectfully dissent.

**I.**

The majority denies petitioner Mark Robertson habeas corpus relief because it believes the Texas Special Issues provided the jury an adequate vehicle for registering its moral response to Robertson's evidence of childhood abuse in making its death penalty determination.[38] In Penry I, however, the Supreme Court held that the special issues are insufficiently capacious to encompass the kind of evidence Robertson offers here, making today's decision contrary to Supreme Court precedent. Moreover, even assuming arguendo that the Court left "unplumbed" the issue of whether evidence of childhood abuse alone is adequately considered within the special issues, Penry I's reasoning dictates finding the special issues insufficient here. While Robertson did receive a "nullification instruction" that was not received by Penry, Penry

---

[38]There is no dispute that evidence of substance abuse is adequately encompassed within the special issues. Harris v. Cockrell, 313 F.3d 238, 242 (5th Cir. 2002).

v. Johnson, 532 U.S. 782, 803-04 (2001) (Penry II), makes clear this instruction did not resolve the Penry I problems present here.

A.   The Penry Decisions

In Penry I, the Supreme Court held that (1) "at the time Penry's conviction became final, it was clear from [Lockett v.Ohio, 438 U.S. 586 (1978),] and [Eddings v. Oklahoma, 455 U.S. 104 (1982),] that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty," 492 U.S. at 318; (2) "[t]he rule Penry [sought]—that when such mitigating evidence [of his mental retardation and abused childhood] is presented, Texas juries must . . . be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed—is not a 'new rule' under Teague because it is dictated by Eddings and Lockett," id. at 318-19; (3) "[u]nderlying Lockett and Eddings is the principle that punishment should be directly related to the personal culpability of the criminal defendant," id. at 319; (4) "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence," id.; (5) "[i]n order to ensure reliability in the determination that death is the

appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime," id. at 328; and (6) therefore, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused [childhood] background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision," id. at 328. (Internal quotations and citations omitted).

Thus, the Supreme Court in Penry I agreed with Penry's argument "that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its reasoned moral response to that evidence in determining whether death was the appropriate punishment." Id. at 322. The Court explained in detail why it rejected the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the three special issues. Id.

The first special issue, which asked whether the defendant acted "deliberately and with the reasonable expectation that the death of the deceased . . . would result," impermissibly limited

74

the jury's function because the term "deliberately" had not been defined by the Texas Legislature, the Texas Court of Criminal Appeals, or the trial court's instructions. Id. at 322. Even if the jurors "understood 'deliberately' to mean something more than . . . 'intentionally' committing murder, those jurors may still have been unable to give effect to Penry's mitigating evidence in answering the first special issue." Id. The reason was "deliberately" was not defined "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." Id. at 323. Consequently, the Court concluded, unless there are "jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue." Id. at 323. "Thus, we cannot be sure that the jury's answer to the first special issue reflected a reasoned moral response to Penry's mitigating evidence." Id. (internal quotation omitted).

The second special issue, which asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," permitted the jury to consider and give effect to Penry's mental

retardation and childhood abuse as "relevant only as an aggravating factor[.]" Id. The second special issue was inadequate both because it only gave effect to Penry's evidence as an aggravating factor, and because it did not allow the jury to give full effect to Penry's mitigating evidence. Id. at 323. Thus, the Court concluded that Penry's evidence of mental retardation and childhood abuse was a "two-edged sword," diminishing "his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future.[39] Id. at 324.

As a result the majority held, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentence." Id. at 328.

In Penry II the Court again confronted the constitutionality of Penry's death sentence, this time after re-sentencing in the wake of Penry I. Texas attempted to correct the defects the Court identified in Penry I with a supplemental instruction to the three special issues. This so-called "nullification instruction" said:

---

[39]The third special issue, which asked "whether the conduct of the defendant in killing the deceased was unreasonable in response to provocation, if any, by the deceased," was not relevant there (or here) because provocation was (and is) not in issue.

76

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

Penry II, 532 U.S. at 789-790.

The Penry II Court explained that there were two interpretations of this instruction, neither of which resolved the concerns it identified in Penry I. First, the Court noted the instruction may have told jurors to consider Penry's mitigating evidence within the special issues. But such an interpretation left "the jury in no better position than was the jury in Penry I," because "none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse." Id. at 798. Alternatively, the instruction may have asked the jury to answer "no" to a special issue if it believed Penry did not deserve the death penalty, regardless of its honest answer to the question.

77

This interpretation was also constitutionally unsound because it would require jurors to violate their oath to render a "true verdict" to give effect to Penry's evidence, putting jurors in a logical and ethical bind.  Id. at 799-800.  Thus, the Penry II majority concluded, the Texas court ruling that the supplemental instruction cured the Penry I problems was objectively unreasonable.

B.    Applicability to Robertson

From the Penry I opinion it is clear that the Court considered Penry's abused childhood, as well as his mental retardation, to be independently relevant mitigating evidence that the jury should have been instructed that it could consider and give effect to in determining whether to impose the death penalty.  In reversing Penry's death sentence, the Court concluded that "his mitigating evidence of mental retardation **and childhood abuse** has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its reasoned moral response to that evidence in determining whether death was the appropriate response."  Penry I, 492 U.S. at 322 (emphasis added); see also id. at 312 (listing as separate evidence of Penry's possible reduced personal culpability "his mental retardation, arrested emotional development, and abused background"); id. at 323 ("[B]ecause of his history of childhood abuse, that same juror [who concluded that

Penry acted 'deliberately,'] could also conclude that Penry was less morally culpable than defendants who have no such excuse[.]")

As Robertson has presented evidence of childhood abuse here, Penry I, along with Penry II, should be outcome determinative. Under Penry I, the special issues given at Robertson's trial, which were identical to those given in Penry's trial, were an inadequate vehicle for allowing a jury to consider Robertson's child abuse evidence in making a reasoned death penalty determination. And the nullification instruction does not change this result.[40] Penry II, 532 U.S. at 803-04.

The majority responds to this clear textual command from the Court that the special issues are constitutionally infirm where a defendant presents evidence of childhood abuse with two arguments. First, it argues that "[c]hildhood abuse alone is not systematically discussed by Penry I" because there the evidence of child abuse "was inseparable from the Court's greater concern with Penry's mental retardation and poor impulse control." Second, the majority contends that it is neither "logically or empirically true that generic childhood abuse, of whatever duration, type, or severity, bears the same characteristics as mental retardation."

---

[40]As Judge DEMOSS' dissent explains the nullification instruction here and in Penry II were similar, although not identical. But neither the majority, nor Texas asserts that the differences affect our analysis here.

As to the first argument, the Supreme Court never suggested that either mental retardation or childhood abuse evidence by itself could be constitutionally weighed and acted upon by a jury within the shackles and confines of the special issues. If, as the majority argues, the Court's "greater concern" was with mental retardation, it is odd the Court did not choose to list just mental retardation or "lost impulse control" as the factor the special issues could not accommodate. Or, if the Court wanted to impart its belief that childhood abuse is evidence that only in conjunction with mental retardation requires a special instruction, it easily could have used the phrase "mental retardation with childhood abuse" or "mental retardation caused by childhood abuse," rather than "mental retardation **and** abused childhood," to describe the problematic evidence. Thus, I, unlike the majority, am willing to credit the Court with saying what it means: that the Texas special issues are not equipped to handle child abuse evidence.

But even assuming the majority's cramped reading of Penry I is correct, and the Court did not explicitly hold that childhood abuse evidence is not adequately encompassed by the Texas special issues, the Court's reasoning in Penry I, applied to childhood abuse, mandates the same result. Childhood abuse evidence alone raises the same constitutional problems as the joint mental retardation/ childhood abuse evidence in Penry I. The first issue of "deliberateness," not further defined, does not allow a jury to

reflect its conclusion that while a defendant purposely committed a murder, his culpability for that purposeful killing was reduced as a consequence of his abuse as a child. Penry I, 492 U.S. at 322-23. And the second special issue, future dangerousness, raises an even more troubling scenario of a "two-edged sword," where child abuse serves as an aggravating, rather than mitigating, factor. Id. at 323. As Chief Justice Rehnquist noted in a different context in Santosky v. Kramer, 455 U.S. 745, 789 (1982) (Rehnquist, J., dissenting), "[i]t requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens."[41] Given such common knowledge of the greater likelihood of recidivism among abused children, the Texas special issues leaves a jury with no room to register its conclusion that while a defendant is a future threat to society, his abuse as a

_____

[41]Or perhaps it does require a citation. The majority suggests that childhood abuse of lesser duration or severity may not have the same effect within the Texas special issues system as the very serious childhood abuse Penry suffered. I take this to mean that the majority contends that in cases of less serious childhood abuse the evidence is not necessarily aggravating because there is a lesser risk of recidivism than among the seriously abused because the effects of less severe childhood abuse are treatable. Motley v. Collins, 18 F.3d 1223, 1235 (5th Cir. 1994). As an empirical matter this is not necessarily correct. A study done by the State University of New York (SUNY)- Albany showed that the **fact** of child maltreatment, rather than its **form**, was the greatest predictor (and presumably cause) of later delinquency. Office of Juvenile Justice and Delinquency Prevention, U.S. Dep't of Justice, Juvenile Justice Bulletin, In the Wake of Childhood Maltreatment (Aug. 1997).

child reduces his responsibility for that threat, making use of the death penalty inappropriate.[42]

Thus, even assuming we are operating without a Supreme Court decision on whether evidence of childhood abuse alone can be considered within the Texas special issues, the presence of the same concerns the Court found with the evidence in Penry I mandates a finding that the special issues are constitutionally infirm here.

**II.**

The majority fails to reach this result today because it relies on what I believe is an erroneous line of precedent first established in our en banc decision in Graham v. Collins, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc). Under the Graham test whether a defendant's mitigating evidence is not adequately encompassed within the Texas special issues, turns on whether that evidence meets four stringent criteria: voluntariness, permanence, severity, and attribution. The majority describes these requirements for "constitutionally relevant mitigating evidence" "readily apparent from the Court's opinion in Penry I." I believe, however, that it is "readily apparent" that this test bears no connection to the reasoning underlying the Penry I decision.

---

[42]And under the Court's decision in Penry II, the presence of the nullification instruction does not change this outcome. Penry II, 532 U.S. at 803-04.

The Supreme Court's most fundamental holding regarding mitigating evidence at the capital sentencing phase is that "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence." Penry I, 492 U.S. at 318. This evidence includes "any aspects of a defendant's character or record and any of the circumstances of the offense that a defendant proffers as a basis for a sentence less than death." Id. at 317 (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion)). Where our en banc decision in Graham and its progeny go wrong is by failing to ask the fundamental Penry I question of how, if at all, the Texas special issues allow a jury to give meaningful consideration to a particular piece of mitigating evidence. For the Graham test to be correct under Penry I, the Texas special issues must allow a jury to adequately weigh a piece of mitigating evidence wherever that evidence does not fall within the Graham criteria. But this is not the case. For example, how do the special issues allow a jury to weigh evidence of a defendant's childhood abuse where the crime is not directly **attributable** to that abuse? Under the Texas system a jury could believe that this history of abuse made a defendant more likely to commit future crimes, but, absent a meaningful mitigating evidence instruction, would have no outlet to express its determination that

83

the defendant is not morally culpable enough, as a consequence of his history of abuse, for the death penalty.[43]

The majority makes two responses to the argument that the Graham line of cases misapplies Penry I. First, the majority notes that Supreme Court decisions in Graham v. Collins, 506 U.S. 461 (1993), and Johnson v. Texas, 509 U.S. 350 (1993), established the principle that Penry I is an exception to Jurek v. Texas, 428 U.S. 262 (1976), which found that the Texas special issues system was not unconstitutional on its face, rather than vice versa. How this rather unremarkable statement alters the Penry I analysis escapes me. In both Graham and Johnson the question was whether youth as a mitigating factor was adequately accounted for within the Texas special issue system. Significantly, in determining whether the special issues were sufficiently capacious to encompass evidence of youth, the Court did not pick up the four-pronged Fifth Circuit test the majority advocates here. Rather, it answered the question

---

[43]Of course the majority may respond that one is not less morally culpable for a crime because of a history of child abuse unless the crime can be proven by expert testimony to be attributable to that abuse. While I disagree with this conclusion, the opinion of the court on this matter is, frankly, irrelevant. It is the province of the jury in Texas, as sentencer, to weigh mitigating evidence and draw inferences of culpability from that evidence. Penry I, 492 U.S. at 328 ("...the **jury** must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime."); id. at 318 (explaining that under Lockett and Eddings the **sentencer** must be allowed consider all mitigating evidence). Our Graham test substitutes this court's cramped judgment of what is mitigating for that of the jury.

Penry I mandated it answer: whether the Texas special issues allowed a jury to express its belief that because the capital defendant was young when he committed his crime, he is not morally deserving of the death penalty. Graham, 506 U.S. at 475 (explaining essence of Penry I is whether relevant mitigating evidence is placed beyond the "effective reach of the sentencer"); Johnson, 509 U.S. at 367 ("The question presented here is whether the Texas special issues allowed adequate consideration of petitioner's youth.") And the answer there was yes, because unlike with evidence of childhood abuse, the impact of youth at the time of committing a crime can be reflected in a "no" to future dangerousness, to reflect the lower risks of recidivism with age. Graham, 506 U.S. at 475 ("[I]t is evident that Graham's evidence–unlike Penry's– had mitigating relevance to the second special issue concerning his likely future dangerousness.") Johnson, 509 U.S. at 368 ("We believe there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination.")

Thus, the important principle to derive from Graham and Johnson is that in those cases the Court reaffirmed the basic test of Penry I for when the Texas special issues transgress the Eighth Amendment (i.e., when they do not allow a jury to consider a particular piece of mitigating evidence in making the death penalty

85

determination).  And this bears little resemblance to our en banc Graham test.

Perhaps realizing that allusions to Graham and Johnson would not rescue its four-headed hydra, the majority stretches even further in its second defense of its test, ascribing significance to the Supreme Court's failure to grant certiorari in earlier cases challenging it.  It should not bear repeating that denial of certiorari does not shed any light on the views of the Court on the merits of the dispute in which the petition was denied.  Holloway v. McElroy, 632 F.2d 605, 636 n.50 (5th Cir. 1980).  But more startling is the majority's cavalier expectation that the Supreme Court repeatedly consider Texas death penalty cases to sort out the applicable legal standards, rather than recognizing our responsibility to get those cases right using previous Supreme Court decisions.  Rather than counting on the Court's denials of certiorari, the majority would have been well served to attempt to apply the principles of Penry I here, lest the Court decide to again correct an "unreasonable" application of its existing precedent.  Penry II, 532 U.S. at 803-04.

## III.

Today's decision is deeply troubling.  Petitioner Robertson introduced mitigating evidence of childhood abuse in the penalty phase of his trial, but that evidence could not be considered by

86

the jury in making its moral, reasoned death determination because of the limited special issues inquiry.  Yet rather than require Texas to re-sentence Robertson in line with constitutional minimums, as mandated by Penry I and Penry II, the majority applies a test that bears little relation to Supreme Court precedent to find Robertson's sentence constitutionally sound.  And rather than attempt to apply the Court's clear principles, the majority resorts to inapposite precedent and counting cert denials to defend its actions.  Because I believe this is wrong, I cannot join the majority.